## JOSEPH F. TYSON *vs.* GEORGE BOOTH.

On the closing of an evening school in the country, the schoolboys threw snowballs from the schoolhouse lot into an adjoining curtilage, near the fence of which its owner was standing on his own land with a gun loaded with powder and shot, having gone there, so armed, in anticipation of some such attack on his premises. Upon one of the snowballs striking his female servant, who was standing in his doorway, where she had gone to see what would happen when the school should close, he fired the gun in the direction from which the snowballs were thrown, not having heard any voice, nor being able to descry the assailants in the darkness; and part of the charge wounded one of the schoolboys. In an action against him by the boy thus shot, to recover damages on account of the wounds, *Held,* that it was no justification for the shooting, that on several occasions during the ten previous days the schoolboys threw inkstands and pieces of ice and of iron at the defendant's dwelling-house, and once hit him with snowballs and broke a window in the house, on which occasion he threatened to shoot if they did not stop, and made complaint to the schoolmaster; that at their recess on that evening they threw a great number of snowballs into his curtilage, some of which struck the house, and one came near his person, and, on his firing a blank charge from a pistol at that time, the plaintiff used insulting language to him and declared that he could not stop him from throwing as many snowballs as he pleased; that the schoolboys had threatened to raise hell or the devil with him that night; that he had been warned that they had procured clubs with which to beat him if he entered the schoolhouse yard that night; that the plaintiff had participated in these previous assaults on his premises and threats against him; and that about the time of the shooting the plaintiff's voice was heard by others inciting the boys to their attack. *But held, also,* that evidence of such participation of the plaintiff in previous threats and attacks was competent on the question of damages, as tending to show his participation in the attack in which he was shot.

In an action for an assault, the plaintiff, without specially alleging such an element of damages in his declaration, may prove, in aggravation of damages, that he became subject to fits as a result of the assault.

TORT for shooting the plaintiff. The defendant justified on the ground that he fired the shot in defence of himself, his house and household, against assaults made and threatened by the plaintiff and his associates.

At the trial at November term 1867, before *Chapman*, J , these facts appeared : The defendant occupied, with his family and

servants, a lot of land with a dwelling-house, in Dartmouth, separated by a wall from another lot on which stood a schoolhouse, the distance from his dwelling-house to the wall being sixty-six feet. There was a side door in the dwelling-house, which overlooked the school-lot. During the winter of 1866-1867, school was kept in the schoolhouse two evenings each week for several weeks, attended by the plaintiff, and finally was closed on the evening of February 1, 1867. At the time when it was closed, the defendant was standing on his lot, near the wall, with a gun loaded with powder and shot. The plaintiff left the schoolhouse, and walked a few paces, when he turned back, on being called by a boy behind him. The defendant, who was then eighty-five feet distant from the plaintiff, drew up his gun, and fired it, and a large number of the shot struck the plaintiff, one of them entering his right eye, and more than sixty his legs, arms and abdomen.

The defendant introduced evidence tending to show that he took his position near the wall, with the gun, before the school closed, and that several members of his household were standing on the step or on the sill of the side door, which was open, " having gone there to see what was going on as the school children came out; " that as soon as the boys came out of the schoolhouse a great number of snowballs were thrown at his house, and one of them hit one of his servants on the head, who was standing in the doorway; and that, upon ascertaining that the servant was hit, he fired his gun in the direction from which the snowballs had come, but did not aim at the plaintiff, and was not able, in the darkness, to distinguish any of the scholars.

The defendant further offered to prove " that, at a recess of the school, which took place half or three quarters of an hour before its close, the plaintiff and other boys came out and threw pieces of iron, inkstands, leaden balls, snowballs and ice, which hit the defendant and some members of his family, and his house; also that similar acts had been done by the boys a few days before; and that the plaintiff and some of his associates had said they intended to raise the devil with the defendant and

these declarations had been communicated to the defendant."
On the objection of the plaintiff, the judge excluded the evidence thus offered; the jury found for the plaintiff, with damages in the sum of $2300; and the defendant alleged exceptions.

*L. Lapham,* for the defendant.

*T. M. Stetson,* for the plaintiff.

HOAR, J.   The ground upon which the evidence was rejected at the trial was the well established rule of law that in an action for an assault and battery the defendant may show in mitigation of damages immediate provocation, — that is, such as happened at the time of the assault, — but not such as previously happened.   *Avery* v. *Ray,* 1 Mass. 12.   And we have no doubt that the ruling of the presiding judge was so far right, that nothing which was said or done by the plaintiff at any time before the time of the assault upon him was admissible, either in justification of the assault or in mitigation of damages.

But another view of the evidence has been presented at the argument, upon which the court are of opinion that it should have been admitted.   The defendant was allowed to show in mitigation of damages the assault upon his house and family at the time he discharged the gun which wounded the plaintiff. But to make this proof of any avail against the plaintiff, it was necessary to satisfy the jury that the plaintiff participated in the assault, and thus furnished the provocation.   Whatever had any legitimate tendency, therefore, to show that the plaintiff was present aiding and abetting, would be material for this purpose.

The plaintiff came out of an evening school with a number of other schoolboys, and as soon as they came out a large number of snowballs were thrown at the defendant's house.   There was evidence which tended to prove that the plaintiff had turned back to speak to another boy who called to him, and did not himself throw any of the snowballs.   But he was present when they were thrown; and if he was a party to the arrangement, if the snowballs were thrown in pursuance of a plan in which he shared as a confederate, he would be responsible for what was done by the others as much as if he did it himself.

Now, to show this confederation, the defendant offered to

prove that at the last time the same crowd of boys came out of the schoolhouse, and not more than three quarters of an hour before, the plaintiff had joined with them in throwing missiles at the defendant, his family and his house; that these missiles were pieces of iron and lead as well as balls of snow and ice; that they had done the same thing a few days before; and that the plaintiff and some of his associates had said they intended to raise the devil with the defendant; and we think the evidence should have been received.

Suppose that the plaintiff had been indicted and tried for the assault with the snowballs at the time the gun was fired. It would be shown that he was present; that within an hour he had been engaged with the same party in the same species of violence; and that he had previously threatened mischief. Would not this have some tendency to show that his presence was that of one of the assailing party, concurring in and encouraging their act? It would of course not be conclusive, for he might have abandoned the unlawful purpose; but, as circumstantial evidence, it would be entitled to some consideration.

Or suppose that several persons were indicted for setting fire to a building, and the proof was that they were passing along the road together when some of them set the fire. If it could be shown that the party had attempted to set the fire as they passed a short time before; that one of them himself lighted the match, and had threatened mischief to the owner of the building; would it not be clearly competent as leading to the conclusion that he was a partaker in the final act, and not a mere spectator?

Where unlawful acts of the same general character are continuous in their nature, and appear to be parts of a general scheme or plan, participation in them at an earlier stage is the usual evidence that one who was afterward present was a participator then. This rule of evidence is of familiar application in criminal trials for conspiracy, treason, riots and unlawful assemblies; and has some bearing upon a case like the one at bar.

The evidence does not seem to have been of much impor

tance; as the purposes of schoolboys are not usually very persistent, and are subject to easy and frequent changes. Nor does the provocation received by the defendant appear to have been such, in any aspect, as would detract much from his responsibility in resorting to the use of a deadly weapon. But, as we think the evidence rejected was proper for the consideration of the jury, he is entitled to a new trial.      *New trial granted.*

Upon the new trial, before *Wells*, J., it appeared further that the plaintiff was a boy nineteen years old; and that the school was a writing school, and the number of scholars, besides the plaintiff, was only ten or twelve.

The defendant, for the purpose of justifying his act, was permitted to testify that on January 21 the schoolboys threw snowballs, some of which struck him as he was coming up from his cellar, and he called out to them at that time that he " should shoot if they did not stop;" that " after this a pane of glass was broken in the house," and he then " got his gun, but did not use it," went to the schoolhouse, asked but could not ascertain who broke the glass, and then threatened to break up the school, when " the master said that he would inquire into it, and afterwards came over and settled for the broken glass;" that on several occasions between that time and February 1 " sundry missiles, such as inkstands, iron balls and chunks of ice, had been thrown from the schoolhouse grounds upon the roof of his house, and he heard them strike and roll off upon the ground;" that " at one time prior to February 1 the plaintiff in his hearing used insulting language to and concerning him in connection with the snowballing;" and that " threats made by some of the scholars that they were going to raise hell with him that night, being the last night of the school, were communicated to him by other parties," and " he received information a few days before, and again the same evening, that the boys had got clubs and calculated to beat him with them if he went into the schoolhouse yard that night."

He further testified that, on the evening of February 1, before school began, a boy came out of the schoolhouse and threw an

inkstand which struck the roof of his dwelling-house; that, at their recess, the boys threw as many as twenty-five snowballs, some of which struck his house and outbuildings, and one came very near his person, and he then fired a blank charge from a pistol, and the plaintiff used insulting language to him at that time and said, " I'll fire as many snowballs as I've a mind to, and you can't stop it; " and that, about the time of the closing of the school later in the evening, he took a gun, which had been loaded with shot for game a week before, and not discharged, and "went out to the wall to defend his premises," " his purpose in going out that night being to defend his premises and to resist any attack that might be made upon him ; " that the boys began to come out from the school just about the time when he took his position by the wall, and in about five minutes " snowballs began to come ; " that the third or fourth snowball, he thought, struck an inmate of his house, Mrs. Willard, on the head, as he could see " by the lights," and he " fired just as soon as he saw that snowball pass ; " that he heard nothing said by the boys before he fired, nor any voice at that time ; and that the snowballing had been going on, he thought, five minutes before he fired.

" There was other evidence as to snowballs and other missiles being thrown upon the defendant's premises and against his house ; of threats by the schoolboys against him, some of which were communicated to him ; and that the plaintiff participated therein. Mrs. Willard, and her daughter and grandson, all inmates of the defendant's house, testified to snowballs being thrown against the house after the school closed that night and before the defendant went out with his gun ; and Mrs. Willard, and another witness who lived near, testified to hearing the plaintiff's voice, shortly before the gun was fired, threatening or inciting the other boys to renew the attack upon the defendant or his premises.

" It did not appear that the plaintiff or any of the scholars had ever entered upon the defendant's premises, or attempted to enter, or made any demonstrations towards such an attempt to enter, or made any other assault or attack thereon than by

throwing snowballs and other missiles from the grounds belong-ing to the schoolhouse : nor that any injury had been occasioned thereby to the defendant, or any member of his family, except that Mrs. Willard was hit by a snowball, but not hurt, at the same time that the gun was fired ; nor that any damage was done to his house or premises, except the breaking of the pane of glass about ten days before. The defendant admitted that the shooting was not accidental.

" Upon this evidence the judge ruled, and instructed the jury, that there was no fact in the case, and no evidence competent and sufficient to prove any fact, that would justify the shooting, so as to sustain the defence ; that the plaintiff was entitled to recover ; and that the only question for the jury was the amount of damages to which he was entitled.

" The instructions upon the question of damages were not objected to, except so far as they related to the claim of the plaintiff that he had been subject to violent and dangerous fits since the shooting, which were a part of the result of the injury, and for which he sought to recover increased damages. The defendant objected, in the first place, that evidence could not be introduced to sustain this ground of damage, because it was special, and not set forth in the declaration ; but the judge over-ruled this objection, and admitted the testimony.

" The plaintiff and his father and mother testified that since the injury he had been afflicted with liability to sudden and se-vere fits, in which he became unconscious and helpless, so that he could not be safely left a long time alone ; that he never had anything of the kind before, except that when three years old he had a convulsion or spasm after a fall from the porch of the house. In contradiction of the mother, evidence was introduced of declarations by her that the plaintiff at one time, within five or six years, was affected with a convulsion in consequence of going into water too frequently or remaining in it too long. The evidence tended to show that the plaintiff received about seventy shots in his person, only ten or twelve of which were ever extracted ; that one shot entered just below the right eye, and lodged upon or near the optic nerve, ultimately destroying the

sight of that eye, one entered the chest and either passed into the cavity of the chest, or so nearly through as to render it unsafe to reach it with a probe; and seven perforated and passed within the cavity of the abdomen. The physician who attended him while suffering the immediate effects of the injury, but had not seen him in any of the fits, testified that foreign substances, like shot, lodged in the cavity of the chest or abdomen, or elsewhere pressing upon a nerve, might so affect the spinal cord or nervous system, and through these the brain, as to produce convulsions or fits like those described; that the shots which the plaintiff received were sufficient to account for the fits; but that there was no certainty that they were produced by that cause; and that other causes might produce them.

" The defendant contended that upon this testimony the plaintiff was not entitled to recover increased damages on account of these fits, or his liability to fits. But the judge ruled that it was a question of fact for the jury; that the burden was upon the plaintiff to satisfy them, by the preponderance of the testimony, so that they should be convinced that the fits were the result of the injury and did not result from some other cause; and that, if they were not so convinced by the evidence before them, they could not take the liability to fits into consideration at all in estimating the damages."

The jury returned a verdict for the plaintiff, and assessed damages in the sum of $5875, and the judge reported the case for revision by the full court; if any of his rulings or instructions were wrong, the verdict to be set aside and a new trial granted of the whole case, or of the assessment of the damages, as the court might direct. The argument on this report was had at October term 1869.

*L. Lapham*, for the defendant.

*T. M. Stetson*, (*T. D. Eliot* with him,) for the plaintiff, was stopped by the court.

CHAPMAN, C. J. If in a civil action or an indictment for an assault and battery the defendant sets up as a justification that it was committed in defence of himself or other persons whom he has a right to protect, or for the protection of his property, it

must appear that the violence committed by him was not ex-cessive, and was reasonably necessary under the circumstances. This has been held so long and so many times that it is not nec-essary to refer to authorities, but it must be regarded as element-ary law. It is generally true that the question whether the violence was excessive is a question of fact to be submitted to the jury. *Hannen* v. *Edes*, 15 Mass. 353. *Commonwealth* v. *Goodwin*, 3 Cush. 154. But in the latter case it is said by the court that the jury should be instructed that if they believed that the defendant did discharge the pistol as alleged, (which was denied,) such an act, so commonly dangerous to life, would not be justified by the acts complained of. These acts were far more violent than the acts of the schoolboys which the defend-ant complains of in this case. And in *Cockcroft* v. *Smith*, 2 Salk. 642, it is said that the defendant may not, upon a little blow from the plaintiff, give him a blow that maims him. See also *Collins* v. *Renison*, Sayer, 138, and *Gregory* v. *Hill*, 8 T. R. 299, where, the facts being admitted, the court decided that the violence of the defendant was excessive.

In the present case, if the truth of the defendant's evidence be fully admitted, and all possible inferences drawn from it in his favor, there is nothing to justify the act which he admitted to have been done by him intentionally. There is no evidence stated in the report upon which it would have been competent to a jury to find that his act was justified. A murderous as-sault with a musket loaded with shot was palpably and grossly out of all proportion to the exigency. And when there is no evidence sufficient in law to sustain the defence, it is the duty of the court to instruct the jury that it is so.

If the plaintiff became subject to fits after the shooting, and if they were a part of the result of the injury, the plaintiff was entitled to recover for such damage, without specially alleging it, as well as for the pain and disability which followed the in-jury. *Exceptions overruled.*