Wilson vs. Young, impleaded, etc.

## WILSON vs. YOUNG, impleaded, etc.

IMPEACHMENT OF WITNESS. (1) *Proper form of question to impeaching witness.*

DAMAGES — ASSAULT AND BATTERY. (2–4) *What compensatory damages include. How far absence of malice may be shown in mitigation of damages.*

1. For impeaching the credibility of a witness, the questions to be asked must relate not to his " general reputation," without further qualification, but to his " general reputation for truth and veracity."

2. In an action for assault and battery, *compensatory* (as distinguished from *punitive*) damages are of two kinds: (1) Those which may be recovered for the actual personal or pecuniary injury and loss; the elements of which are, loss of time, bodily suffering, impaired physical or mental powers, mutilation and disfigurement, expenses of surgical and other attendance, and the like. (2) Those which may be recovered for injuries to the feelings, arising from the insult or indignity, the public exposure and contumely, and the like.

3. Compensatory damages of the *first* kind are to be determined without reference to the question whether defendant was influenced by malicious motives in the act complained of; and, on the other hand, evidence of threatening or aggravating language, or malicious conduct

Wilson vs. Young, impleaded, etc.

on *plaintiff's* part (not constituting a legal *justification* of defendant's act), cannot be considered in *mitigation* of such damages.

4. Compensatory damages of the *second* kind depend entirely upon the *malice* of defendant; and as evidence of such malice may be given to increase that kind of damages, so evidence of threatening or malicious words or acts on plaintiff's part, just previous to the assault, though not constituting a legal justification, should be admitted to mitigate or even defeat such damages.

DIXON, C. J., is of opinion that proof of words and acts of provocation on plaintiff's part, immediately previous to the assault and constituting a part of the *res gestæ*, should be considered in mitigation of *compensatory damages in general*, adhering to the view expressed in *Morley v. Dunbar*, 24 Wis., 183.

APPEAL from the Circuit Court for *Fond du Lac* County.

This action was against *George* and *Alfred Young*, to recover damages for personal injuries received by the plaintiff.

It appears that the defendant *George Young*, assisted by *Alfred*, was engaged in executing a writ of restitution issued by a justice of the peace in an action against one Amos Felt, the former having been specially authorized by the justice to execute the same; and while they were so engaged, an altercation arose between the parties, during which *George Young* fired a loaded pistol at the plaintiff, the ball from which struck the plaintiff in the cheek, knocked out several of his teeth, and passed out through his lip, which was torn and somewhat disfigured thereby.

The testimony concerning the particular circumstances of the altercation is conflicting; but that on the part of the defendants tends to show that *George Young* ordered the plaintiff off the premises of which restitution was being made, and the plaintiff refused to go; that, after expostulating with him, the defendants proceeded to remove a washing machine on which the plaintiff was sitting, when the latter arose, struck and pushed *George*, holding in the hand with which he inflicted the blow a piece of iron like a link of a chain; that thereupon *George* seized hold of him, and called on *Alfred* for assistance to put him off the premises; that the plaintiff struck *Alfred*

with the iron; and, as they were about to throw him into the road, the plaintiff said if they would let him go he would leave, and they accordingly released him, when he rose, and said to *Alfred* with an oath, "If I get hold of you, you are gone," or "If I get another fair blow at you, you are gone;" and as he was in the act of striking *Alfred* again, *George* fired the pistol, and inflicted the injury complained of. The defendant *George Young* denies that he intended to hit the plaintiff. The testimony also tends to show menaces or threats of resistance by the plaintiff to the execution of the process.

On the trial, one Lucinda Felt was called by the plaintiff as a witness, and gave testimony tending to show that the defendants acted maliciously in shooting and wounding the plaintiff. For the purpose of impeachment, the defendants called as a witness Herman Snyder, and asked him if he knew the general reputation of Mrs. Felt in the neighborhood where she lives. The witness answered in the affirmative. The question was then put to him, " Is that character good or bad ? " The court sustained an objection to the question, and ruled it out. The same ruling was made on an objection to the following question : " From this general character, would you believe her under oath ? " The witness also testified that he was not much acquainted with the general reputation of Mrs. Felt for truth and veracity. The court refused to give the following instruction, asked for by defendant's counsel : " If the jury find that the plaintiff used threats or aggravating language to the defendants, or was guilty of malicious conduct just prior to the assault, that goes in mitigation both of exemplary and of actual damages."

The jury returned a verdict for the defendant *Alfred Young*, and for the plaintiff as against the defendant *George Young*, and assessed the damages at $1,750. A motion for a new trial was overruled by the court, and judgment was duly entered on the verdict against *George Young*, who appealed therefrom.

*E. P. Smith* (with *A. Scott Sloan*, of counsel), for appellant, to

the point that the court erred in excluding the questions put with a view of impeaching plaintiff's witnesses, cited *Johnson v. The People*, 3 Hill, 178; *Corning v. Corning*, 2 Seld., 104; *Wright v. Paige*, 36 Barb., 438–446, and 3 Keyes, 586; 2 Cow. Tr. (3d ed.), 450; 1 Greenl. Ev., § 451; *Hume v. Scott*, 3 A. K. Marsh., 260; *Tacket v. May*, 3 Dana, 79; *State v. Boswell*, 2 Denio, 209; *Day v. The State*, 13 Mo., 422. 2. To the point that provocation, by word or act, just prior to the assault, may be given in mitigation of damages, counsel cited *Morely v. Dunbar*, 24 Wis, 183, and cases there cited; *Prentiss v. Shaw*, Am. Law Reg., Dec. 1869, p. 712.

*Lewis & Fribert*, for respondent, contended that the impeaching question should have been confined to the character for truth and veracity of the witness sought to be impeached, citing *Wilson v. The State*, 3 Wis., 798; *Ketchingman v. The State*, 6 id., 426, 431; *Bakeman v. Rose*, 14 Wend., 105, 110; *Gass v. Stinson*, 2 Sum., 605. 2. They also contended that the doctrine of *Morley v. Dunbar*, 24 Wis., 183, was merely *obiter dictum*, and was contradictory to the opinion of the court in *Birchard v. Booth*, 4 Wis., 75, 76, and the authorities there referred to.

LYON, J. I. The first question presented by this appeal is, whether a witness who is called by one party for the purpose of impeaching the credibility of a witness called by the other party, may be interrogated as to the general reputation of the latter, or must the interrogatory be restricted to his general reputation for truth and veracity?

Professor Greenleaf, in his treatise on the law of evidence, vol. 1, § 461, says that the regular mode in such cases is, to enquire of the witness whether he knows the general reputation of the person in question among his neighbors, and what that reputation is. It is understood that the latter part of the question is not admissible, unless the witness testify that he is acquainted with such general reputation. But in a note to that section (note 3), it is said: "Whether this enquiry into the

general reputation or character of the witness should be restricted to his reputation for truth and veracity, or may be made in general terms, involving his entire moral character and estimation in society, is a point upon which the American practice is not uniform. All are agreed that the true and primary inquiry is into his general character for truth and veracity, and to this point, in the northern states, it is still confined. But in several of the other states greater latitude is allowed." The question has not been determined in this state to my knowledge, but is still an open one here; and we are at liberty, therefore, to adopt the rule which seems to us to be founded on the better reasons.

In *Wilson v. Noonan,* 27 Wis., 598, I had occasion to express my individual opinion upon the principle involved in the question under consideration. The complaint in that action charged the defendant therein with having written and published a libelous article which imputed corrupt conduct in office to the plaintiff, who was a member of the state senate. It was held that it was competent for the defendant to show, in mitigation of damages, that the reputation of the plaintiff for official integrity was bad. I then thought, and still think, that in an action of that kind, testimony to impeach the reputation of the plaintiff should be restricted to his reputation in respect to the particular fault or offense which the alleged libel or slander imputes to him. The reasons there given for such opinion are applicable here, and need not be repeated.

If those views are correct, it follows logically that the interrogatory put to an impeaching witness should be restricted to the general reputation *for truth and veracity* of the witness sought to be impeached. A person who brings an action for libel or slander puts in issue his general reputation in the particular in which his character has been assailed; and his general bad reputation in that particular may be shown by the defendant in mitigation of damages. So a party who produces a witness upon the stand, and seeks to derive benefit from his

testimony, puts in issue, in a certain sense, the character of his witness for truth and veracity. In the one case the plaintiff must be prepared to sustain his reputation in the particular in which it has been assailed; and in the other case the party must, in like manner, be prepared to sustain the reputation of his witness for truthfulness, or suffer the consequences. It is reasonable to require a party to be thus prepared, for he knows in advance wherein the reputation of himself or his witness is liable to be assailed; and he may, if he can, prepare to meet and repulse the assault. But if his reputation, or that of his witness, may be assailed generally, then must he come to the trial prepared to defend at all points, and to prove that in all respects the reputation so assailed is good. To require him to do this is unreasonable, and not in accord with the analogies of the law.

The doctrine that evidence of general reputation may be given without restriction, in such cases, is necessarily based on the assumption that a single vice, whatever it may be, contaminates and poisons the whole moral nature — that if a person is bad in any particular, he is, necessarily, thoroughly and entirely bad. For example, that if he is profane, he is therefore a thief; if a sabbath breaker, a liar; if avaricious, unchaste; if a drunkard or an habitual violater of the public peace, a murderer. To embrace such a doctrine as this, the student of moral philosophy would be compelled to shut out from his mind the teachings of his daily experience. Certainly there can be no rule of law which endorses and approves a doctrine so absurd.

But it is said that a man may have grave vices, and still it cannot be shown that his general reputation for truth and veracity is not good. This seems to be a controlling consideration in some of the cases which hold that the inquiry of the impeaching witness need not be restricted to the reputation for veracity. The answer to this argument is, that if the vices of the person sought to be impeached do not affect his reputation

for truthfulness, their existence ought not to impair the credibility of his testimony. If, on the other hand, they are of a character which pollute the moral nature, as if such person were a cheat, a swindler, an habitual perpetrator of fraud and wrong, I conceive there will be little difficulty in making proof that the general reputation of such person for truth and veracity is bad.

The cases on this subject cited in *Wilson v. Noonan* may be consulted with profit. For convenience they are again cited here. *Conroe v. Conroe*, 47 Pa. St., 198; *Mayer v. Mayer*, 49 id., 210; *Atwood v. Impson*, 20 N. J. Eq. R. (5 Green), 150.

In every view which I have been able to take of the question, my mind is impelled to the conclusion that the interrogatory propounded to the impeaching witness should have been restricted to the general reputation for truth and veracity of the witness sought to be impeached, and that the learned circuit judge ruled correctly that the interrogatory as to her general reputation, not thus restricted, was inadmissible.

II. The remaining question is, Did the court err by refusing to instruct the jury that threatening or aggravating language used by the plaintiff to the defendants, or malicious conduct of the plaintiff, just previous to the assault, should go in mitigation both of *exemplary* and *actual* damages?

The instructions, so far as they appear by the bill of exceptions, were quite favorable to the defendants, yet none of them are equivalent to that of the above purport, which the court refused to give.

It will be readily admitted, no doubt, that the circumstances indicated in the instruction which the court refused to give, if they existed, would go in mitigation of *exemplary* damages.

The precise question is, therefore, whether those circumstances may also go in mitigation of the *actual* damages sustained by the plaintiff. It may here be remarked that by the term "actual damages," I understand is meant all damages which the law gives as *compensation* for the injuries sustained,

as distinguished from those which may be given in proper cases by way of example and punishment.

In *Birchard v. Booth*, 4 Wis., 67, which was an action to recover for personal injuries inflicted by the defendant upon the plaintiff, it was held that the latter was entitled to recover a fair compensation for all the losses and injuries which he actually sustained, without regard to the provocation he may have given, if such provocation did not constitute a legal justification for the assault and battery. In *Morely v. Dunbar*, 24 Wis., 183, the question was again before this court, and the chief justice there expresses the opinion, that, " notwithstanding what was said in *Birchard v. Booth*, circumstances of provocation attending the transaction, or so recent as to constitute part of the *res gestœ*, though not sufficient entirely to justify the act done, may constitute an excuse which will mitigate the actual damages; and where the provocation is great, and calculated to excite strong feelings of resentment, may reduce them to a sum which is merely nominal. This seems to follow as the necessary and logical result of the rule which permits ex· emplary damages to be recovered." p. 187. He also cites numerous cases to sustain the foregoing views. While many of those cases fail to make a distinction between compensatory and exemplary damages, and hold that provoking language or malicious acts of the injured party may mitigate damages generally, some of them do make the distinction, and hold the doctrine laid down by the chief justice. We are now to inquire which of these conflicting views is the correct one, if either is correct ; or whether there is not some middle ground which can be occupied and sustained on correct principles.

This inquiry leads us to examine with some .care the nature of damages in actions like this, and the conditions which entitle the injured party to recover them. Most of the cases, and among them those decided by this court, mention but two kinds of damages, actual or compensatory and exemplary or punitory. And doubtless all damages which can be recovered

in such actions are either compensatory or exemplary. But this classification may be made more specific. Compensatory damages are of two kinds : 1st. Those which may be recovered for the actual personal or pecuniary injury and loss, the elements of which are, loss of time, bodily pain and suffering, impaired physical or mental powers, mutilation and disfigurement, necessary expenses of surgical and other attendance, and the like ; and, 2d. Those which may be recovered for injuries to the feelings, of which latter class the elements are, the insult, the indignity, the public exposure and contumely, and the like. That damages for injury to the feelings are actual or compensatory in their nature, cannot well be doubted ; yet, unlike those for the mere personal or bodily injury, such damages can only be recovered when the aggressor is animated by a malicious motive — when there is an intention on his part to outrage the feelings of the injured party, to insult, to aggravate or to oppress. Sedgwick on Damages, 33. The right to recover exemplary damages rests upon precisely the same grounds.

Now the principle upon which proof of the language and conduct of the plaintiff is admissible in these actions, in proper cases, is, briefly, that inasmuch as the malice of the defendant may be proved to aggravate the damages, therefore the malice of the plaintiff may be shown to mitigate the same. But the malice of the defendant can never increase the damages for the actual pecuniary injury and loss, that is, for the mere personal injury. These are entirely unaffected by the presence or absence of malice by the defendant. Such being the case, on what principle can it be held that the malice of the plaintiff may mitigate those damages? Certainly the principle just stated does not lead to that result.

But damages for injury to the feelings, and exemplary damages, depend entirely upon the malice of the defendant ; and these may be mitigated, and perhaps in most cases entirely defeated, by proof of the malicious language or conduct of the plaintiff, although the same does not constitute a legal justifi-

cation of the injury.　This seems to me to be the true application of the principle which admits evidence of the malice of the plaintiff in mitigation of damages.　Such an application of the principle resolves the damages which may be recovered into the constituent parts thereof, and leaves the element which the malice of the defendant cannot increase, unaffected by the malice of the plaintiff, while it permits those elements which depend upon the malice of the former to be mitigated or entirely destroyed by proof of the malice of the latter.　In *Morely v. Dunbar*, the chief justice says :　" Where motive constitutes a basis for increasing the damages of the plaintiff above those actually sustained, there it should, under proper circumstances, constitute the basis for reducing them below the same standard."　I think the principle there stated lacks the qualification above indicated, that in no case can the motive of the plaintiff reduce the damages below compensation for the actual bodily injury and pecuniary loss resulting from the act of the defendant.

It has already been said that the most of the cases on this subject mention but two kinds or classes of damages in actions for personal injuries.　However, Mr. Sedgwick, in his treatise on the measure of damages, informs us that the classification of compensatory damages here attempted to be made is fully recognized in the laws of Scotland (p. 33, note w).　I believe that such classification is inherent in our law, and cannot be ignored without disregarding the fundamental principles upon which rests the right to recover damages in actions like this.

But there is one case, at least, in this country, wherein the views here advanced are fully adopted.　That is the case of *Prentiss v. Shaw*, 56 Me., 427, cited in *Morely v. Dunbar* from 8 Am. Law Reg., N. S., 712 ; and it demands something more than a mere passing notice.　The action was for personal injuries inflicted by the defendants therein upon the plaintiff, under the following circumstances: The plaintiff, upon being informed thereof, expressed his gratification that President

Lincoln had been assassinated; whereupon the defendants, acting under the advice of a provost marshal, and being accompanied by a crowd of excited men, seized him while he was at a blacksmith shop having his horses shod, forcibly placed him in a wagon, transported him, a prisoner, three miles to a village, and confined him for several hours in a room in a hotel there.   During this time persons in the crowd threatened him with extreme personal violence.   On the same day he was taken by the defendants before a public meeting of the citizens, called at the town house, at which a moderator and clerk were chosen and acted officially.   The meeting passed a vote that the plaintiff be discharged on his taking an oath to support the constitution of the United States.   He voluntarily took such oath, and was thereupon discharged.

On the trial of the action, the presiding judge instructed the jury that the defendants had shown no legal justification for their acts, and must be found guilty; that the only question for the jury was the amount of damages; that the plaintiff claimed damages on three grounds:   1st.  For the actual injury to his person and for his detention; 2d.  For the injury to his feelings, the indignity and the public exposure; and 3d.  For punitive or exemplary damages.   That they were bound to give, at all events, damages to the full extent for the injuries to the plaintiff's person, and for his detention; and that as to damages for the second and third grounds, it was for the jury to determine, on the whole evidence, whether any should be allowed, and the amount.   He also explained to the jury the nature and grounds of such damage, and instructed them, *inter alia*, that they could only consider the evidence introduced by the defendants under the second and third heads above set forth, and in mitigation of any damages they might find under either or both of said heads, if, in their judgment, those facts did mitigate such damages; but that they could not consider them under the first head. The plaintiff had a verdict for six dollars and forty-six cents; and the case came before the supreme court of Maine on excep-

Wilson vs. Young, impleaded, etc.

tions to the above instructions taken and alleged by the plaintiff. That court held that the instructions to which exceptions were taken were correct; that the judge who presided at the trial gave to the jury " the rules on this subject which are practical and in accordance with common sense and the general principles of the law ; " and it overruled the exceptions. The opinion of the court in that case (from which there does not appear to have been any dissent) was written by KENT, J., and is a most able and convincing exposition of the law of damages in actions for personal injuries, and fully sustains the correctness of the foregoing instructions.

I have thus endeavored to demonstrate that the malice of the plaintiff may, in proper cases, be shown in mitigation of compensatory or actual damages; and if the effort has been successful, it follows that the instruction asked by the defendants in this case, and refused by the circuit judge, should have been given, but with the explanation (if the plaintiff desired such explanation), that the aggravating language or malicious conduct of the plaintiff could only mitigate those compensatory damages which might be given for injury to his feelings.

The jury gave quite heavy damages, and the verdict ought not to stand unless those rules of law which are favorable to the defendant were fully given to the jury. Believing that this was not done, I think that there should be another trial.

Mr. Justice COLE concurring in the above views, the judgment of the circuit court must be reversed, and a *venire de novo* awarded.

DIXON, C. J. My learned associate who writes the opinion of the court in this case, unintentionally no doubt but nevertheless in fact, misstates and does injustice to the position of the late Mr. Justice PAINE, when he speaks of the views expressed in *Morely v. Dunbar* as being those of myself alone, and not of the court of which I was the mere exponent or representative.

I had supposed, until this case arose, that the views there expressed met the approbation of every member of the court. I had a right to think so, since I am certain Mr. Justice COLE expressed no disapprobation or contrary opinion at the time. But if I was mistaken in this, I know I was not with respect to the views entertained by Mr. Justice PAINE, and I am positively sure that I hazard nothing of departure from the exact truth when I say that he fully concurred in every word contained in the opinion upon the point of damages here involved. ·The fact is, as I have good cause to and do well remember, that the opinion was written to suit and express, as nearly as I was able, the precise views which he took of the question, and his reasons for those views.    It will be borne in mind that he was of counsel for the defendant in error and prevailing party in the case of *Birchard v. Booth*, and argued that case in this court, and that the conclusion reached in *Morely v. Dunbar* was directly opposed to that for which he had argued and in which he had been sustained in the former case.    This was a marked circumstance connected with the case, and one which serves distinctly to recall to my mind all that took place in the consultation. It was an affair of some delicacy for Mr. Justice PAINE to repudiate the views for which he had contended with earnestness and sincerity in *Birchard v. Booth*, and yet such were the great qualities of his mind that he could do so without the least hesitation or reserve when convinced of his error.    That was but one of the many occasions on which the learned judge displayed that singular freedom from prejudice and disposition for dispassionate and thorough and impartial examination, which so characterized his judicial career.    The question was very thoroughly canvassed and considered both by him and myself, and he fully agreed in the views expressed in the opinion.    And if he had not done so, every one at all acquainted with the operations of his mind, its firmness and energy, and the readiness and zeal with which he attacked positions and opposed theories or principles which he considered wrong, must know that the occasion

would not have passed withont an opinion from him, stating his views and showing wherein and for what reasons he differed. The opinion, therefore, was that of the court, and not of myself alone, and as such should be received and considered.

And I still adhere to the decision then made, and think it should not be disturbed or unsettled. I fail to perceive anything in the reasoning of my present associate, or in that of the court to whose decision he refers, to convince me that the court was wrong in *Morely v. Dunbar*. I think the question was rightly decided, and must stand by the decision so long as I am convinced of its correctness. I am not so "profoundly skilled in analytic," that I can, upon such a question,

> —— "distinguish and divide
> A hair 'twixt south and southwest side."

I can enter into no argument to prove that the mental sufferings of the party injured cannot depend upon the motive of the party inflicting the injury. The affirmation or statement of the proposition is its own best refutation. Bad intent or malicious motive in the defendant may co-exist with those circumstances of indignity which cause great mental suffering or injury to the feelings, but it has no necessary connection with or dependence upon such circumstances. The circumstances causing injury to the feelings may exist to the fullest extent without any predetermined malice whatever on the part of the assailant, and when he is aroused and provoked to sudden passion only by the malicious conduct and wicked motives of the assailed. It is a proposition which nobody disputes, that the injuries to the person for which compensation is recoverable in actions of this nature, consist in the pain suffered, bodily and mentally, and in the expenses and loss of property they occasion. This rule is universally acknowledged, with innumerable decisions and precedents in its favor, and none against it so far as I know. Mental pain, distress and anxiety of mind, are as much and as truly part of the actual

injury for which actual compensation should be given, as are distress, pain and disease of body, or expenses actually incurred, or loss of time and property proceeding from the same cause. Any attempt, therefore, to distinguish between these as the grounds of actual compensation, or for the purpose of mitigation, where that is proper, is fallacious and unfounded, and must in the end fail of success. It cannot but call forth from intelligent and considerate sources such criticisms as that of Judge REDFIELD upon the decision in *Prentiss v. Shaw,* the first case and only one before the present in which the discrimination was ever thought of or attempted. I cannot but regard Judge REDFIELD's strictures as most well deserved and opportune. He speaks of the decision as a " slipshod way " of dealing with and disposing of the question, and, referring to the charge of the court below, which was sustained by the opinion of the full bench, remarks upon it as follows : " The error of the charge seems to be in treating ' the injury to the plaintiff's feelings, the indignity and public exposure ' as forming no part of the *actual damages* in the action. Nothing could be further from the truth ; since these things not only constitute a portion of the actual damages, but the principal portion. It is scarcely possible to conceive any proposition more unjust or unreasonable — not to say absurd — than to suppose, in a transaction like that through which the plaintiff was dragged by the defendants, that the actual ' injury to his person, and his detention,' embraced all for which he was entitled to compensation under the head of actual damages." And again he says : "And there is no case, except the present, so far as we have noticed, which attempts to discriminate between corporeal and external injuries, and those which affect the sensibilities."     8 Am. Law Reg., N. S., 726.

I fully coincide with the views thus expressed by the eminent jurist and author whose words I have quoted, and believe it will be found as difficult as he represents, to point out a scintilla of authority any where in support of the attempted dis-

crimination. The supposed distinction is as unsustained by authority as it is unfounded in principle and destitute of any sound process of reasoning upon which to maintain it.

Upon this question, as upon nearly all others, the truth seems to lie at one extreme or the other. Either the decision in *Morely v. Dunbar* was all right, or it was all wrong. Logically and upon principle there can be no "middle ground" between the rule which it establishes and the rule of those cases which hold that no circumstances of malicious conduct and provocation on the part of the plaintiff will reduce his damages in an action for personal injury below compensatory or actual damages, unless such circumstances amount to a complete justification. Compromise or "middle ground" makes shipwreck of principle. It has done so here. Between the rule for which Judge REDFIELD seems to contend, and which is that last stated, namely, that compensatory or actual damages must in all cases be given, and that circumstances of provocation can only be urged in reduction or extinguishment of damages which are vindictive or punitory, and the rule for which I contend, which is that of *Morely v. Dunbar*, the distinction and difference of principle upon which the rules respectively rest are broad and marked, and I can readily perceive how different minds might rationally and logically disagree with respect to them. But it is not so when we come to the hair-splitting operation of resolving actual damages into their real or supposed elements, and attempting to discriminate between this element and that, and holding that compensation for the one may be reduced or withheld, while that for the other shall not be, on account of the provocation by which the whole injury was produced. There cannot, as it seems to me, exist any sound basis for such discrimination; and, being subversive of principle and wholly illogical and arbitrary, it works only confusion of ideas, and must lead to the greatest embarrassment in the administration of justice. I could never give my assent to it, but, for the sake of being governed by some kind of principle would far rather

return to the rule of *Birchard v. Booth.* And this is the rule which Judge REDFIELD seems to look upon as correct, and it is not unsustained by some very respectable.authority. *Donnelly v. Harris,* 41 Ill., 126; *Cushman v. Waddell,* 1 Baldwin, 57; 3 Am. Jurist, 301.

But, as will be seen by recurring to the references in *Morely v. Dunbar,* by far the greatest weight of authority is in favor of the rule there held. But those are not by any means all the decisions which sanction the rule. On the other hand they are so numerous that those to the contrary constitute a most insignificant exception. I cite also the following: *Rhodes v. Bunch,* 3 McCord, 65; *McKenzie v. Allen,* 3 Strobh,, 546; *Matthews v. Terry,* 10 Conn., 459; *Coxe v. Whitney,* 9 Mo., 531, 532; *Collins v. Todd,* 17 Mo., 539, 540; *Corning v. Corning,* 6 N. Y., 103; *Willis v. Forrest,* 2 Duer, 318; *Tyson v. Booth,* 100 Mass., 258; *Marker v. Miller,* 9 Md., 338; *Bingham v. Garnhault,* Buller's N. P., 17.

And the case of *Prentiss v. Shaw,* instead of being a *limitation* of the same rule, is in reality only an *extension* of it. My brethren, as I think, entirely misapprehend the effect of the decision in this particular. That was not a case of immediate *private* or *personal* provocation producing the injuries complained of, and the decision has no direct or proper application to provocation of that kind. It was the *public misconduct* of the plaintiff which was there received in mitigation of damages for the injuries inflicted upon him by the mob, and upon the distinction stated. It is this feature of the decision which Judge REDFIELD so sharply criticises, and I think with reason and propriety. I question whether the principle of mitigation goes so far, but yet the court did so *extend* it, subject only to the limitation arbitrarily fixed in the opinion.

As observed by the court in *Willis v. Forrest,* "the rule as first laid down in this country, so far as we find, in *Avery v. Ray,* prevails, with scarcely an exception, if indeed there is any, in all the states of this Union, and its justness and policy have

been dwelt upon, and favorably considered, in a large number of cases. It is the established rule of this state, and has been followed and recognized in several cases decided since that of *Lee v. Woolsey*."

And upon principle, I cannot doubt the correctness of the rule. The man who stands in or walks the street back and forth in front of my house, or enters my yard, for the base and hateful purpose of applying opprobrious epithets or using scurrilous and indecent language to my wife or daughter or other unoffending and helpless member of my family, and, when I warn him to desist, does not, and whom, then, acting under the impulse of the just and uncontrollable indignation and wrath thus excited, I proceed to publicly chastise or knock down and silence as he deserves—such a man, I say, is entitled to no compensation for the actual damages which he has thus deliberately and of his own wrong and malice brought upon himself. It would be the height of injustice to say that I should pay his doctor's bills, or compensate him for his bodily pain and loss of time or property during the period of his confinement or disability occasioned by the injury. It may be all right to discourage breaches of the peace, personal rencounters, and every species of brutal force which tend to uncivilize the community. This is the principle upon which the opposite rule is founded; but still I think there is a limit to it, or to that policy which does not encourage men in taking the law into their own hands. I think this much is due and allowable for the infirmities of men, and by way of discouraging lawless and malicious conduct and provocation. As correctly remarked by Chief Justice LE GRAND, in *Gaither v. Blowers*, 11 Md., 552: "The law mercifully pays this tribute to the weakness and infirmities of human nature, which subject it to uncontrollable influences when under great and maddening excitement superinduced by insult and threats. But it wholly discountenances that cruel disposition which for a long time broods over hastily and unguardedly spoken words, and seeks, when opportunity offers,

to make them an excuse for brutal behavior. With such a temper it has no sympathy. It charitably deals with sudden gusts of feeling, but rigorously with the malignant and cruel. This is its ethics." I agree with the court, therefore, in *Rhodes v. Bunch*, where it said that the defendant in an action of assault and battery may prove that the plaintiff traduced his character, insulted his wife or daughter, or that he found him within his enclosure attempting to steal his goods; or any other fact to show the motive which induced the act. And I concur also in the further observation of the court in the same case, that, " although men are not to be encouraged in taking the law into their own hands, either to obtain satisfaction for a private injury, or to redress a public wrong, yet the law will excuse when it cannot justify, and mitigate when it cannot excuse, if the transaction has proceeded from a proper motive, and the injury to the party complaining is not greater than he deserved."

Entertaining these views, I agree, of course, that the judgment appealed from should be reversed, though I dissent in part from the opinion pronounced by my brethren.

*By the Court.*— Judgment reversed