NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

14-P-928                                    Appeals Court

MICHAEL A. LIND, coadministrator,[1] & another[2] vs. DOMINO'S PIZZA LLC & another.[3]

No. 14-P-928.

Hampden.     March 12, 2015. - July 29, 2015.

Present: Grainger, Meade, & Fecteau, JJ.

Practice, Civil, Summary judgment, Change of ruling, Instructions to jury, New trial. Rules of the Superior Court. Contract, Franchise agreement, Third party beneficiary. Negligence, Vicarious liability, Duty to prevent harm, Expert opinion. Evidence, Expert opinion. Witness, Expert.

Civil action commenced in the Superior Court Department on June 16, 2009.

A motion for summary judgment was heard by Constance M. Sweeney, J., and was reconsidered by Richard J. Carey, J.; the case was tried before him, the entry of separate and final judgment was directed by him, and a motion for a new trial was considered by him.

---

[1] Of the estate of Corey M. Lind.

[2] Lisa A. Bishop, coadministrator of the estate of Corey M. Lind.

[3] Domino's Pizza, Inc.

John J. Egan for the plaintiffs.
Paul G. Boylan (Kevin G. Kenneally & John F. Burke, Jr., with him) for the defendants.

FECTEAU, J.  Plaintiffs Michael Lind and Lisa Bishop, coadministrators of the estate of their son, Corey M. Lind (Corey), appeal from separate and final judgments entered in the Superior Court resolving all claims in favor of the defendants Domino's Pizza LLC and Domino's Pizza, Inc., in connection with the plaintiffs' wrongful death action filed pursuant to G. L. c. 229, § 2.[4]  The plaintiffs challenge as error the reconsideration and partial allowance by the judge, on the eve of trial, of the defendants' motion for summary judgment.[5]  The plaintiffs also challenge rulings made by the judge during trial excluding certain testimony and declining to give a particular jury instruction.  Finally, the plaintiffs contend the judge erred in denying their motions for reconsideration and a new trial.  We affirm.

_____

[4] The ten-count complaint for wrongful death and conscious pain and suffering alleged the following causes of action against these defendants:  breach of voluntarily assumed duty (Counts I and II); general negligence (Counts III and IV); third-party beneficiary (Counts V and VI); negligent supervision (Counts VII and VIII); and vicarious liability (Counts IX and X).

[5] All counts, with the exception of those that alleged breach of a voluntarily assumed duty (Counts I and II), were dismissed as a result.

Background.  The relevant facts are largely undisputed.
In June, 2003, David Jenks, the president of Springfield Pie,
Inc. (Springfield Pie), entered into a "Standard Franchise
Agreement" (franchise agreement) with Domino's Pizza LLC,[6]
providing that Springfield Pie, the franchisee, would operate a
Domino's Pizza Store at 624 Boston Road in Springfield (Boston
Road store or store).  The franchise agreement generally
provided that Springfield Pie would be bound by basic
operational standards as set forth by Domino's, but would
otherwise exercise control over the day-to-day operations of the
store.

Springfield Pie hired Corey as a delivery driver in 2007 to
work in the Boston Road store.  At about 2:30 A.M. on December
8, 2007, a Saturday, a man named "Alex," later identified as
Alex Morales, telephoned the Boston Road store and reached
Cassandra, the wife of the store's manager, Carl Johnson.
Morales placed an order, and provided his telephone number and
requested a delivery to 104 Arnold Avenue in Springfield.
Around 2:50 A.M., Corey left to make the delivery at that
address, but he returned a few minutes later because the address
was not valid.  Cassandra telephoned Morales and told him that

_____

[6] Defendant Domino's Pizza LLC is the operating company and
wholly owned subsidiary of defendant Domino's Pizza, Inc.  We
refer to them collectively as "Domino's."

the delivery driver could not find the address. Morales said he was farther down Arnold Avenue toward Christopher Drive. Cassandra relayed this information to Johnson, who, believing that Christopher Drive ran parallel to Arnold Avenue (not perpendicular, as Morales had indicated), decided to telephone Morales himself. Johnson asked Morales exactly where he was; Morales gave a different, more specific address and claimed that he was in a house. Johnson asked Morales to leave the front porch light on and wait in the doorway for the delivery driver; Morales agreed and Johnson ended the call.

Johnson explained to Corey where the house was located, and showed him the location on the store map. Corey left the store to make the delivery to Morales and a second, separate order after that. Around 3:34 A.M., Morales telephoned the store and said he had not yet received his food. Johnson explained to him that the driver (Corey) did not have a cellular telephone, but that Johnson would make sure that Morales received his order. Johnson left the store to look for Corey, but was unable to find him after searching for about an hour. In the meantime, Johnson telephoned the store and spoke to Cassandra, who told him that Morales had telephoned the store at 3:44 A.M. and said that he no longer wanted the order delivered.

It was eventually discovered that Morales had kidnapped, robbed, and murdered Corey after Corey attempted to deliver the

order to him.  Morales, who confessed to police in varying stages, was convicted of murder in the first degree, armed robbery, and kidnapping, and those convictions were affirmed by the Supreme Judicial Court.  See Commonwealth v. Morales, 461 Mass. 765 (2012).[7]

1.  Summary judgment ruling.  "The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law."  Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991).  See Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002).  The moving party bears the burden of demonstrating affirmatively the absence of a triable issue and entitlement to judgment as a matter of law.  Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989).  In determining whether a genuine issue of material fact exists, the judge must draw all inferences from the underlying facts in the light most favorable to the party opposing the motion.  Attorney Gen. v.

---

[7] Morales initially was a defendant to this instant action but has since been defaulted pursuant to Mass.R.Civ.P. 55(a), 365 Mass. 822 (1974).  He invoked his Fifth Amendment privilege against self-incrimination at the instant trial and did not testify.  No final judgment has entered against him in this case.  In light of this, the judge issued two separate and final judgments pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974), in favor of Domino's on the claims disposed of by the jury verdict and the motion for summary judgment.

<u>Bailey</u>, 386 Mass. 367, 371 (1982). An appellate court reviewing summary judgment must examine its allowance de novo and based on same record as the motion judge. <u>Fortenbacher</u> v. <u>Commonwealth</u>, 72 Mass. App. Ct. 82, 85 (2008).

"We note at the outset that the trial judge had the authority to reconsider the motion for summary judgment sua sponte." <u>Riley</u> v. <u>Presnell</u>, 409 Mass. 239, 242 (1991). Although judges "should . . . hesitate to undo the work of another judge," <u>Peterson</u> v. <u>Hopson</u>, 306 Mass. 597, 603 (1940), we do not agree with the plaintiffs that it was error for the trial judge, sua sponte, to reconsider Domino's summary judgment motion after it had been denied by another judge. Although this practice might not follow recommended procedures, see Superior Court Rule 9D, "there is no lack of power" to do so, and, until final judgment is entered, a judge is free to do so. <u>Peterson</u> v. <u>Hopson</u>, <u>supra</u>. See <u>Dolan</u> v. <u>Von Zweck</u>, 19 Mass. App. Ct. 1032, 1034 (1985) ("An order merely denying a motion for summary judgment . . . does not amount to a final judgment and may be modified or changed at any time prior to final judgment"). Here, there was additional evidence entered in the record following the initial November 8, 2012, denial of the motion, and before the May, 2013, partial allowance of the motion. Moreover, this is not a case where the judge's reconsideration of a motion previously denied "further exacerbated" a party's

predicament by, for example, forcing it to alter entirely its defense on the eve of trial without the benefit of a requested continuance.  See Barbosa v. Hopper Feeds, Inc., 404 Mass. 610, 622 (1989).  We turn now to the merits of each claim pleaded by the plaintiffs and dismissed on summary judgment.

a.  Vicarious liability.  The parties agree that the controlling decision where a plaintiff seeks to hold a franchisor vicariously liable for an alleged tort of its franchisee is Depianti v. Jan-Pro Franchising Intl., Inc., 465 Mass. 607 (2013) (Depianti).[8]  In Depianti, the Supreme Judicial Court noted that the usual rules of agency do not transfer easily to the franchisor-franchisee context because, although franchisors are required under the Lanham Act, 15 U.S.C. § 1064(5)(A) (2006), to maintain baseline controls and standards relating to their trademarks, Federal rules concerning trademark protection were "not intended to 'create a [F]ederal law of agency.'"  Id. at 615, quoting from Oberlin v. Marlin Am. Corp., 596 F.2d 1322, 1327 (7th Cir. 1979).  The mere fact that franchisors set baseline standards and regulations that franchisees must follow in an effort to protect the franchisor's

---

[8] Depianti was issued approximately one month after the defendants' summary judgment motion was allowed in part.  Both the plaintiffs and Domino's urge its application on appeal.  We note that the judge below cited nearly identical law in resolving the vicarious liability claims against the plaintiffs.

trademarks and comply with Federal law, does not mean that franchisors have undertaken an agency relationship with the franchisee such that vicarious liability should apply.  See ibid.  Ultimately, the Supreme Judicial Court, referencing with approval the analysis of Kerl v. Dennis Rasmussen, Inc., 273 Wis. 2d 106 (2004) (Kerl), held that "a franchisor is vicariously liable for the conduct of its franchisee only where the franchisor controls or has a right to control the specific policy or practice resulting in harm to the plaintiff." Depianti, supra at 617.  The specific policy or practice should "be understood broadly, as the particular practice of the franchisee that led to the plaintiff's injury."  Id. at 617 n.11.

Other jurisdictions have applied similar tests and, in doing so, have consistently ruled that, as matter of law, franchisors are not vicariously liable for the alleged torts of their franchisees.  See, e.g., Wendy Hong Wu v. Dunkin' Donuts, Inc., 105 F. Supp. 2d 83, 88 (E.D.N.Y. 2000) (determining as matter of law that franchisor not vicariously liable for franchisee's security deficiencies because franchise agreement did not give franchisor "considerable control . . . over the specific instrumentality at issue"); Kerl, supra at 131-134 (restaurant franchisor not vicariously liable for franchisee's negligent supervision of employees where franchisor had no

control or right of control over daily hiring and supervision of franchisee's employees).  But see Butler v. McDonald's Corp., 110 F. Supp. 2d 62, 67-68 (D.R.I. 2000) (denying franchisor's summary judgment motion because franchisor required franchisees to conform to comprehensive system, inspected franchisee premises and operations frequently, took profits, and had a right to terminate agreement in event of franchisee breach).[9]

Applying the Depianti test here, we conclude that the plaintiffs failed to establish a genuine issue of fact whether Domino's either controlled or had the right to control the specific policy or practice that resulted in harm to Corey.  We note initially that the "specific policy or practice resulting in harm to the plaintiff" is difficult to ascertain in a context such as here, where the harm was caused by a third party acting

---

[9] See also Viches v. MLT, Inc., 127 F. Supp. 2d 828, 832 (E.D.Mich. 2000) (granting summary judgment on basis that hotel franchisor not vicariously liable for franchisee's negligent use of pesticides where franchise agreement only ensured "uniformity and standardization . . . of services" [citation omitted]); Pizza K., Inc. v. Santagata, 249 Ga. App. 36, 37-39 (2001) (franchisor not vicariously liable for franchisee delivery driver's accident because franchisor did not supervise day-to-day activities of franchisee's employees); Vandemark v. McDonald's Corp., 153 N.H. 753, 763 (2006) (restaurant franchisor not vicariously liable for attack on franchisee's employee because franchisor established uniformity and standardization of products and services, but did not exercise control over security operations).  But see Miller v. McDonald's Corp., 150 Or. App. 274, 281 (1997) (franchisor could be vicariously liable where franchisee's patron bit into sandwich that contained stone because franchise agreement provided "precise methods" of food handling and preparation).

malevolently.  However, inasmuch as actions by Springfield Pie or Domino's "resulted in harm" or, in other words, caused or contributed to the harm to Corey, the focus is correctly placed on the instrumentality of pizza delivery under the circumstances presented in the early morning hours of December 8, 2007.  The plaintiffs seek to define the specific policy or practice more broadly as pizza delivery in general, but this ignores that the circumstances presented on December 8, 2007 -- including the fact that it was around 3 A.M. when Corey left the store, and in response to a caller who provided three different addresses, two of them not valid -- were inherently more dangerous than other potential deliveries, such as mid-day deliveries to customers who provide a correct address that bear no relation to the circumstances at bar.  Therefore, the specific policy or practice here is properly defined as pizza delivery at 3 A.M., following a series of calls that, when viewed in a light most favorable to the plaintiffs, were reasonably suspicious.

When viewed in the proper context however, it is clear that the plaintiffs failed to proffer evidence that Domino's controlled or had the right to control this specific policy or practice of the Boston Road store.  Although Domino's mandated that all franchisees remain open until 1 A.M. on Fridays and Saturdays, it was solely Springfield Pie's decision to remain open until 3 A.M.  Moreover, although Domino's -- pursuant to

the franchise agreement as well as the "Delivery Area Security Procedure Manual" -- generally required franchisees to deliver all orders, Domino's explicitly left it to the discretion of the franchisee whether to deliver under circumstances that appeared dangerous.  For example, the franchise agreement states that franchisees are "not required to offer delivery service in areas which might present a danger to you or your employees." Additionally, Domino's required that store telephones have a caller identification system in place or use "security callbacks" in the absence of caller identification to follow up on suspicious or late-night orders, or in response to first-time callers.  In an affidavit, Johnson, the manager that night, confirmed that the store was, in fact, solely responsible for deciding to send Corey out on the delivery in question ("the taking of the pizza order by phone, the calls back to 'Alex,' the person making the order, and the process recounted for the delivery of the pizza by [Corey], were all done pursuant to policies developed and implemented by Springfield Pie in the time I had been working there").

Despite the foregoing, the plaintiffs aver that Domino's mandatory requirements that franchisee employees not carry weapons of any type or money in excess of twenty dollars on deliveries, not resist in the event of attempted robbery, and wear Domino's uniforms and place a lighted rooftop Domino's sign

on their vehicles, caused Corey's harm, or at least contributed to it. However, Domino's requirements that drivers wear a specific uniform and place the rooftop sign on their vehicles are precisely the type of operational standards that courts have recognized for protection of a trademark and are insufficient to establish control over a franchisee. See Kerl, 273 Wis. 2d at 126-127 ("[T]he clear trend in the case law in other jurisdictions is that the quality and operational standards and inspection rights contained in a franchise agreement do not establish a franchisor's control or right of control over the franchisee sufficient to ground a claim for vicarious liability as a general matter or for all purposes"). Moreover, it is not reasonable to suggest that the uniform and vehicle sign related in any way to the harm that befell Corey, in light of the fact that Morales specifically placed an order with the store and, therefore, was expecting a Domino's driver.

We acknowledge that Domino's nonresistance policy, prohibition on weapons, and prohibition on drivers carrying more than twenty dollars cannot reasonably be classified as trademark controls, but are rules clearly designed, at least in part, for employee safety. In theory, therefore, these policies provide more of a basis to establish vicarious liability because they are indicative of an intent to assert control over delivery safety protocol. However, when viewed in this particular

context, it cannot be said that those mandatory policies resulted in the harm suffered by Corey.  As to the nonresistance policy, that policy did not apply where an employee was assaulted or otherwise presented with physical danger, such as the case here.  Domino's specifically left it to franchisees to train employees to respond to assaults or other physical dangers.  Moreover, we do not view this record as demonstrating the existence of a genuine issue whether the prohibition on drivers' carrying weapons contributed to the harm suffered by Corey; more significantly, when viewed in the instant context, in a light most favorable to the plaintiffs, the causal link is speculative at best.[10]

Even if the instrumentality or specific policy were to be viewed more broadly as delivery under any and all circumstances, as the plaintiffs urge, the record is clear that Domino's neither controlled nor had the right to control delivery generally at the store.  As discussed supra, Springfield Pie had the exclusive authority and responsibility to train and supervise drivers concerning safety during deliveries, decide to remain open past 1 A.M., decide to suspend temporarily delivery or refuse to make individual deliveries where dangerous, and

---

[10] The plaintiffs have not articulated, and the summary judgment record is silent on, how Domino's policy that drivers carry no more than twenty dollars on their person when delivering food resulted in harm to Corey.

design and implement additional safety protocols, where necessary, over and above the basic requirements imposed by Domino's.[11] Even more generally, the franchise agreement clearly provided that no agency relationship existed between Domino's and Springfield Pie and that the latter was solely responsible for the day-to-day operation of the Boston Road store. See Kerl, 273 Wis. 2d at 132 (noting that license agreement between franchisor and franchisee disclaimed agency relationship, which is "informative but not dispositive" information).[12]

The plaintiffs also place emphasis on § 15.1 of the franchise agreement, which provides that Springfield Pie agrees fully to "comply with all specifications, standards and operating procedures" prescribed by Domino's, including those related to delivery of customer orders, arguing that this

---

[11] There is evidence in the summary judgment record that Springfield Pie did take additional measures to ensure safety. For example, the Boston Road store locked its doors during business hours, necessitating that customers "buzz" in.

[12] Although Domino's retained an inspection right, which it occasionally exercised, and the right to terminate the franchise agreement if Springfield Pie did not comply with mandatory requirements set by Domino's, the right to inspect did not extend to safety issues. Moreover, these types of provisions have been deemed insufficient by other courts to warrant the imposition of vicarious liability on a franchisor. See Kerl, 273 Wis. at 125 ("[B]ecause many franchise relationships include a license to use the franchisor's trade or service mark, the detailed quality and operational standards and inspection rights specified in the franchise agreement are integral to the protection of the franchisor's trade or service mark under the Lanham Act").

provision created a genuine issue of material fact concerning Domino's right to control deliveries. However, the plaintiffs overstate the importance of this provision which, read in context, requires Springfield Pie only to comply with the provisions set out more specifically in other portions of the franchise agreement. The plaintiffs claim that the judge weighed evidence improperly for summary judgment purposes by, in effect, comparing different sections of the franchise agreement; however, the analysis of these issues is essentially contract interpretation, which is a legal, not factual, inquiry proper at the summary judgment stage. See Lumber Mut. Ins. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995).

In sum, Domino's, via the franchise agreement, disclaimed an agency relationship with Springfield Pie and left it exclusively in Springfield Pie's purview to supervise, train, and direct employees as to delivery and safety issues, and to implement safety measures above the baseline standards imposed by Domino's. To the extent that any policy or practice relating to delivery "resulted in" or caused Corey's harm, it was one exclusively controlled by Springfield Pie. Simply put, the harm that ultimately occurred would not have occurred but for the decision by Springfield Pie to send Corey on the delivery in question, despite the possible danger inherent in such a delivery. There is no genuine issue of material fact whether

any policy or practice of Domino's, including the weapon prohibition, is directly and causally related to the harm. In light of the foregoing, the judge's summary judgment ruling on the vicarious liability claim was correct.

b. _Direct negligence_. The plaintiffs sought to hold Domino's directly liable under the theory that Domino's created an unreasonable risk of harm to Corey from third parties. In order to succeed on a claim of negligence, a plaintiff must establish that the defendants owed him a legal duty of care. The existence or nonexistence of such a duty is question of law and is thus an appropriate subject of summary judgment. See Remy v. MacDonald, 440 Mass. 675, 676-677 (2004). "As a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others." Id. at 677. A precondition to this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor. See Foley v. Boston Hous. Authy., 407 Mass. 640, 646 (1990). "[A]s a general rule, there is no duty to protect another from the criminal conduct of a third party." Kavanagh v. Trustees of Boston Univ., 440 Mass. 195, 201 (2003). However, such a duty may arise where the plaintiff has reasonable expectations and reliance that a defendant will anticipate harmful acts of third parties and take appropriate measures to protect the plaintiff from such harm. Ibid.

The parties cite no Massachusetts cases relating to direct negligence principles concerning a franchisor's duty of care to its franchisees' employees.  The most analogous Massachusetts case law is that of tort liability in the context of independent contractors, as set out in Corsetti v. Stone Co., 396 Mass. 1 (1985).  In Corsetti, the issue was whether a general contractor owed a duty of care to an employee of its subcontractor, who had been injured on the job.  See id. at 3, 9-10.  The relevant inquiry was whether the employer maintained "sufficient control over part of the work of an independent contractor to render him liable under [Restatement (Second) of Torts § 414 (1965)]."  Id. at 11.  However, § 414 is "usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job."  Id. at 10, quoting from Restatement (Second) of Torts § 414 comment b.  Clearly, that is a much different situation than the one presented here.  Section 414, as interpreted by Corsetti, has not been adopted in this jurisdiction in whole or in part in the franchisor context. Consequently, Corsetti is instructive to our inquiry, but is not binding or even entirely analogous.

Other jurisdictions that have considered the issue have applied modified versions of § 414 and focused the inquiry on the "extent of the franchisor's control of the daily operation

of the [franchisee's] business."  Hoffnagle v. McDonald's Corp., 522 N.W.2d 808, 814 (Iowa 1994).  See Helmchen v. White Hen Pantry, 685 N.E.2d 180, 181-182 (Ind. Ct. App. (1997) (franchisor liability depends on level of control over franchisee operations); Folsom v. Burger King, 135 Wash. 658, 673 (1998) ("In order to retain sufficient control, a franchisor must retain the ability to make decisions concerning the daily operation of the franchised restaurant").

Here, the inquiry we make is very similar to that applied in the vicarious liability context, but to a different end.  The issue is not to determine whether Domino's should be vicariously liable for a tort committed by Springfield Pie.  We ask how much control Domino's exercised over Springfield Pie's daily operations to determine whether Domino's assumed a duty to protect Corey from this practice. The result is the same.  The plaintiffs did not establish a genuine issue whether Domino's exercised control over the daily operations of Springfield Pie such that Domino's, as matter of law, had a duty to protect Corey from the harm that befell him.  Most baseline requirements imposed by Domino's on the Boston Road store and other franchisees were clearly intended for protection of the Domino's trademark.  Otherwise, franchisees were wholly responsible for the day-to-day operations of their stores, whether in matters of hiring employees, training employees, managing conflicts, or, as

most pertinent here, ensuring the safety of employees.
Therefore, the judge correctly determined that, as a matter of
law, the plaintiffs did not present a triable issue whether
Domino's had a legal duty to Corey to protect him against the
harm that he suffered.

c.  Third-party beneficiary.[13]  When two people enter a
contract for the direct benefit of a third person, that third
party is an intended beneficiary.  See Ayala v. Boston Hous.
Authy., 404 Mass. 689, 699 (1989).  To maintain a cause of
action for breach of contract, a third party must therefore
"show that he was an intended beneficiary" of a contractual
obligation.  Ibid.  "Under Massachusetts law, only intended
beneficiaries, not incidental beneficiaries, can enforce a
contract."  Harvard Law Sch. Coalition for Civil Rights v.
President & Fellows of Harvard College, 413 Mass. 66, 71 (1992).
The intent of the parties to the contract "determines whether a
third party is an incidental or intended beneficiary."  Markel
Serv. Ins. Agency, Inc., v. Tifco, Inc., 403 Mass. 401, 405
(1988).

---

[13] The plaintiffs did not reference this claim or the
negligent supervision and training claim, see infra, in their
appellate briefs on appeal or at oral argument.  Thus, those
claims would ordinarily be considered waived.  See Mass.R.A.P.
16(a)(4), as amended, 367 Mass. 921 (1975).  However, because
waiver makes no difference to the outcome, we consider the
claims on the merits.

In their complaint, the plaintiffs alleged that Corey was a third-party beneficiary of an agreement between Domino's Pizza LLC and the United States Department of Justice. That agreement concerned procedures Domino's would use in limiting delivery areas so as to ensure that any decision to restrict deliveries was not discriminatory.

Assuming that a claim sounding in contract may properly be pleaded in a wrongful death action, we agree with the judge's decision that summary judgment was warranted on this claim. A plain reading of the agreement between Domino's Pizza LLC and the Department of Justice, and the "Limited Delivery Service Standard" and "Delivery Area Security Procedures Manual" that Domino's promulgated in response, clearly indicates that the parties did not manifest an intent to contract for the benefit of Corey specifically or employees of franchisees generally. Compare Ayala v. Boston Hous. Authy., 404 Mass. at 700-702 (primary purpose of contract between parties was to directly benefit plaintiffs). Rather, the Department of Justice agreement, and the Domino's policies created in response thereto, were clearly intended to prevent racial discrimination when limiting deliveries to certain geographical areas. Employee safety was accounted for in Domino's newly created policies, but that was not the primary purpose of the agreement,

such that franchisee employees can be said to be intended beneficiaries of the agreement.

d. _Negligent supervision and training_. The plaintiffs contended that Domino's had a duty to supervise its franchisees "with respect to the store's adoption and implementation of the policies and procedures promulgated and approved by [Domino's] . . . concerning the safety and protection of delivery employees and the training of franchise owners and employees with respect to those policies and procedures." To the extent that this claim depends on an allegation that, because Domino's was negligent in its supervision of Springfield Pie, Springfield Pie did not comply with Domino's baseline safety requirements (i.e., requiring that drivers not carry more than twenty dollars or a weapon), the plaintiffs did not allege in the complaint or argue in their pleadings that Springfield Pie did not follow those requirements.

To the extent that this claim alleged that Domino's acted negligently in the sense that it failed to provide more comprehensive safety regulations that franchisees such as Springfield Pie could have followed, the record as developed at the summary judgment stage showed that Domino's had the right, but not the duty, to promulgate additional safety regulations. This is not a distinction without a difference; the franchise agreement was narrowly prescribed to provide only that Domino's

imposed on franchisees certain baseline safety requirements, contractually obligating Springfield Pie (and other franchisees, given their greater local knowledge), to provide additional safety measures to ensure the safety of their employees.  Since it retained no right to demand more specific and comprehensive safety rules to be followed by all franchisees, it had no duty, either under the franchise agreement or otherwise required by law, to do so.

2.  Trial issues.  a.  Exclusion of testimony.  The plaintiffs first contend that the judge improperly excluded putative testimony from Springfield Deputy Chief of Police Robert McFarlin concerning the relative danger of the city of Springfield in 2007, compared to the rest of the United States. McFarlin had been allowed to testify that "Sector G," where the Boston Road store is located and where Morales's crimes against Corey began, was in the "mid-range of reported criminal activity" compared to other sectors of Springfield.

We discern no abuse of discretion or other error in the judge's exclusion of this testimony on the basis that Deputy Chief McFarlin lacked qualification to testify about this matter.[14]  McFarlin had testified that he had not reviewed the

---

[14] We review the judge's exclusion of the testimony for an abuse of discretion or other error of law.  See Aleo v. SLB Toys USA, Inc., 466 Mass. 398, 406 (2013).

Federal Bureau of Investigation's reports "concerning the comparative statistics between Springfield and other areas," but asserted that "I have a pretty good idea of where [Springfield's crime rate is relative to other locations], and I have a pretty good idea of [the same] in [2007]."  As the proponents of the evidence, the plaintiffs failed to demonstrate that the witness had a specific basis of knowledge to testify concerning statistics gleaned from those reports.  See Aleo v. SLB Toys USA, Inc., 466 Mass. 398, 406 (2013), quoting from Sevigny's Case, 337 Mass. 747, 751 (1958) ("Expert opinion testimony may be excluded 'where it amounts to no more than mere speculation or a guess from subordinate facts that do not give adequate support to the conclusion reached'").  Prejudice to the plaintiffs resulting from the exclusion of this testimony, if any, would likely be mitigated by the general knowledge of jurors about their locale and any relative danger, especially considering the testimony that the deputy chief did provide.  See Commonwealth v. Fitzgerald, 376 Mass. 402, 420 (1978) (discerning no error in prosecutor's remark that there was "fear . . . in those projects" despite lack of evidence on that point because "it was proper for the jury to take into consideration their common knowledge concerning the projects"); Commonwealth v. Kingsbury, 378 Mass. 751, 753 (1979) ("Jurors are entitled to rely on their general knowledge of matters commonly known within

the community").  Additionally, even if exclusion of this putative testimony were error, we view any possible prejudicial effect as slight, because the testimony would not have addressed the type of specific crimes that occurred here.

Second, the plaintiffs argue that the judge erroneously excluded testimony from their expert security witness, Donald Greene, as improper opinion testimony.  Greene was permitted to testify to his opinion of numerous deficiencies in Domino's security plans but was not allowed to provide legal conclusions whether these plans were negligent.[15]  The judge did not err in excluding this proffered testimony.  Although expert witnesses may offer an opinion on the ultimate issues that the jury must decide, see Simon v. Solomon, 385 Mass. 91, 105 (1982), those witnesses generally may not testify as to whether a defendant was negligent or to other matters which "touch[] on reasonable care, an issue properly left for the jury."  Welch v. Keene Corp., 31 Mass. App. Ct. 157, 165 n.10 (1991).

b.  Requested jury instruction.  Finally, the plaintiffs contend that the judge erred in not giving their requested jury instruction on Corey's common-law right to self-defense.  Citing

---

[15] The judge made the ruling prior to the start of Greene's testimony.  Later, the plaintiffs' attorney clarified that Greene would have testified, if allowed, that "the security plan [was] willful, wanton, reckless, gross negligence.  He found it to be one of the worst corporate security plans he had ever reviewed, and those matters were excluded by the Court."

Tyson v. Booth, 100 Mass. 258, 265 (1868), the plaintiffs requested the following instruction: "A person has a right to protect himself from attack provided that no more force than is reasonably necessary for that purpose is used."  The judge declined to give the requested instruction.

We disagree with the plaintiffs that this was error.  The requested instruction did not speak to the use of weapons, and therefore was not applicable to the plaintiffs' argument that Domino's restricted Corey's right to self-defense by preventing him from carrying a weapon.  Moreover, while the Domino's policy prohibited resistance to a robbery, it did not restrict drivers from resisting in the event of violence against their person; therefore, the instruction was not pertinent.  It was within the discretion of the judge to determine whether to refer to parts of the evidence, and to determine that reference to self-defense was unnecessary.  See Poole v. Boston & Maine R.R., 216 Mass. 12, 15 (1913) (within judge's discretion to determine that emphasis on plaintiffs' family businesses would have been disproportionate and unnecessary to proper determination of case); Goldman v. Mahony, 354 Mass. 705, 711 (1968) (within discretion of judge to determine whether to refer to parts of evidence).

3. <u>Denial of motion for new trial</u>.[16]  The plaintiffs
contend that the verdict was against the weight of the evidence.
A trial judge may set aside a jury verdict and order a new trial
if the verdict is against the clear weight of the evidence.
<u>Oldham</u> v. <u>Nerolich</u>, 389 Mass. 1005, 1005-1006 (1983).  This
requires that the judge "is satisfied that the jury have failed
to exercise an honest and reasonable judgment in accordance with
the controlling principles of law."  <u>Ibid</u>., quoting from
<u>Hartmann</u> v. <u>Boston Herald-Traveler Corp</u>., 323 Mass. 56, 60
(1948).  We review for an abuse of discretion.  <u>Hartmann</u>, <u>supra</u>
at 60-61.

The plaintiffs have not met their high burden to show that
the verdict was against the weight of the evidence.  Based on
evidence that Domino's provided basic safety guidelines for use
in franchisee stores, such as requirements that drivers not
carry more than twenty dollars or weapons on their person,

---

[16] The plaintiffs also challenge the judge's decision
declining to alter or amend the partial allowance of summary
judgment, in light of <u>Depianti</u>, <u>supra</u>.  The judge allowed the
plaintiffs' motion for reconsideration, acknowledging that
<u>Depianti</u> was issued after his summary judgment ruling but, on
reconsideration, ruled that his prior decision would stand
unaltered.  For the reasons stated <u>supra</u>, the judge correctly
denied the plaintiffs' motion for reconsideration in light of
<u>Depianti</u> because he did, in fact, cite case law identical to the
rule later announced in <u>Depianti</u> at the time he granted the
summary judgment motion in part, and his ruling that summary
judgment was warranted on the vicarious liability claim was not
erroneous.

provided franchisees with training materials to train their employees, generally monitored franchisees to determine whether they complied with mandatory guidelines, and reserved the right to terminate the franchise relationship in the event of noncompliance, the jury could have found that Domino's reasonably discharged any duty it voluntarily assumed to protect Corey from the foreseeable harm of a third party.

Finally, the plaintiffs advance several related arguments concerning the effect of the judge's partial allowance of the motion for summary judgment just prior to opening statements. The plaintiffs essentially contend that the summary judgment ruling unfairly altered the course of trial. However, allowance of summary judgment by which some claims are dismissed will often alter the course of trial. Other than the issues already discussed above, the plaintiffs point to no exclusion of testimony, disallowance of any argument, or other restriction on the plaintiffs' presentation at trial on the remaining claim of voluntary assumption of duty. Moreover, although the plaintiffs complain that the summary judgment decision freed Domino's to employ an "empty chair" defense -- blaming the party not at trial, Springfield Pie -- such a tactic would have been available to Domino's in some fashion regardless whether other counts, such as vicarious liability, were also tried. In short, although the summary judgment ruling clearly removed some of the

plaintiffs' claims vis-a-vis trial, the plaintiffs have shown no error either in the summary judgment ruling or the effect of that ruling on trial such to warrant a new trial.

<u>Judgments affirmed</u>.

<u>Orders denying motions for reconsideration or to alter or amend the judgment and for new trial affirmed</u>.