J-A26040-22

2023 PA Super 232

| | | |
|---|---|---|
| CLARENCE DAVID CORYELL, AND SANDRA CORYELL, H/W | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| STEVEN MORRIS, JASON DAWSON, ROBIZZA, INC., AND DOMINO'S PIZZA LLC | : | No. 1977 EDA 2021 |
| | : | |
| APPEAL OF: DOMINO'S PIZZA LLC | : | |

Appeal from the Judgment Entered September 21, 2021
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 180602732

BEFORE: BOWES, J., KING, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.: **FILED NOVEMBER 8, 2023**

Domino's Pizza LLC (Domino's) appeals from the judgment entered in the Court of Common Pleas of Philadelphia County (trial court) after a jury found it vicariously liable for the negligence of a delivery driver for one of its franchises. Before trial, Domino's moved for summary judgment, arguing that it could not be held vicariously liable because under its franchise agreement, its relationship with the franchisee was that of an independent contractor-contractee rather than master-servant. The trial court, however, found that there was a genuine issue of material fact and denied the motion, and the jury found Domino's vicariously liable and awarded damages.

---

[*] Retired Senior Judge assigned to the Superior Court.

There are two central issues in this appeal. First, we must determine what we are reviewing: the denial of the summary judgment motion or the denial of the post-trial motion for judgment notwithstanding the verdict (JNOV). Both involve the question of whether the trial court or the jury should have determined vicarious liability. At the summary judgment stage, the parties agreed that the franchise agreement was unambiguous and controlled the franchisor-franchisee relationship. As a result, the parties merely disagreed over the construction of the franchise agreement and whether it created a master-servant relationship. Similarly, at trial there was no disagreement over whether the franchise agreement was unambiguous. Because the franchise agreement was unambiguous, vicarious liability was a legal issue rather than a factual one, and the trial court was obligated to determine that issue.

That does not end the matter, though. Because vicarious liability should have been determined as a matter of law, our second issue is whether the franchise agreement created a master-servant relationship between Domino's and the franchisee. To answer this, we review the agreement under the standard for franchisor-franchisee vicarious liability recognized in **Myszkowski v. Penn Stroud Hotel, Inc.**, 634 A.2d 622 (Pa. Super. 1993). There, we held that our inquiry in such cases focuses on "whether the alleged master has day-to-day control over the manner of the alleged servant's performance." **Id**. at 626. After review, we conclude that the franchise

agreement did not give Domino's day-to-day control over the franchisee. Accordingly, we reverse and remand with instructions.

Now to a more detailed discussion of those issues.

## I.

## A.

On August 15, 2006, Domino's entered into a Standard Franchise Agreement under which Robizza, Inc. (Robizza) was to operate a store (the Store) in Souderton, Montgomery County, Pennsylvania. The Store was operated by Jason Dawson (Dawson), Robizza's owner. The Standard Franchise Agreement authorized Robizza to operate under Domino's name, marks, trade dress, and logos and specified operating and product standards for the Store. Robizza was required to comply with the terms and conditions of Domino's Standard Franchise Agreement, Product Standards and Operating Standards, and the agreement set forth when franchise licensing fees had to be paid to Domino's.

On July 26, 2016, Steven Morris (Morris) was working as a delivery driver for Robizza and driving a car leased by Dawson. While returning from a delivery, Morris collided with a motorcycle driven by Clarence Coryell (Coryell), who was ejected and suffered substantial injuries. On June 22, 2018, Coryell and his wife (the Coryells) filed an action raising claims of negligence and loss of consortium against Morris, Dawson, Robizza and

Domino's. Relevant here, the Coryells alleged that Domino's was vicariously liable for Morris's negligence.[1]

At the end of discovery, Domino's and the Coryells both moved for summary judgment on vicarious liability. While disagreeing over the construction of the franchise agreement and what kind of relationship it created, they agreed that the franchise agreement was unambiguous and controlling. Both also asserted that the trial court and not a jury should determine vicarious liability, since the matter was essentially one of contract interpretation. The trial court, however, denied both motions for summary judgment, stating simply, without explanation, that there was a genuine issue of material fact as to the extent of control asserted by Domino's.

**B.**

At trial, witnesses testified as to the nature of the relationship created by the Standard Franchise Agreement, including testimony based on specific sections in these documents. Because they were testifying about what the Agreement and Operating Standards said, their testimony was consistent.

The Coryells called Roy Jones (Jones), a former Domino's executive who had served in various executive capacities for 30 years. In that time, he was involved with running Domino's corporate-owned stores and in assisting and

---

[1] The Coryells also alleged direct negligence on the part of Dawson, Robizza and Domino's but later withdrew that claim at trial.

overseeing between 1,200 and 2,000 franchised stores for compliance with the Standard Franchise Agreement.

Jones testified[2] regarding mandatory requirements in Domino's Standard Franchise Agreement, Operating Standards, and Product Standards that franchisees such as Robizza were required to meet:

- Follow hours of operation set by Domino's.

- Comply with Section 15.6 of the Standard Franchise Agreement that states that Domino's had the right to set the specifications regarding the equipment, fixtures, furniture, signs, and decorations allowed in the store.

- Comply with standards for quality of ingredients and supplies used in preparation and sale of food products.

- Conform the franchise lease for the store to meet the standards set by Domino's.

- Keep financial records in a manner set by Domino's.

- Follow Domino's Operating Standards which specified how its employees had to act, their demeanor, and how to handle customer complaints; provided how long employees' fingernails and facial hair could be; the size and amount of employees' jewelry; when the store must be cleaned and what types of supplies were permitted; methods of acceptable payment by customers; what topics must be covered in employee training; how much cash, including personal funds, drivers were permitted to carry in the delivery vehicles; and prohibited drivers from carrying mace or other types of personal protection in the delivery vehicles.

- Allow Domino's to inspect store premises any time during open hours.

---

[2] R. 1859-1911a.  For ease of reference, we cite to the reproduced record.

He stated that every store was audited by an independent team roughly four times a year. Every store would usually be visited one to two times per year by the business franchise consultant. If any issues developed out of the inspections, he and his team would follow up with the franchisees to ensure that they corrected the issues and became compliant with the Operating Standards. If a franchisee did not comply with the Standard Franchise Agreement, Operating Standards or Product Standards, it was required to remedy the violation within thirty days. If the violation was not corrected within 30 days, Domino's had the right to terminate the franchise agreement.

Jones acknowledged that consistency standards are inherent in any franchise relationship in which the franchisee creates and assembles a product that is purchased by the customer under the franchisor's brand. In his words, "a brand is a promise of consistency." (R. 1879a). Jones further acknowledged that all franchisors strive to ensure consistency of customer experience through such standards. The goal of uniform standards is to protect the value of the Domino's brand for the benefit of all stakeholders, including franchisees such as Robizza. Jones testified that how each franchisee meets those standards, and the supervision of the franchisee's employees, is left to the discretion of the franchisee. In this case he recognized that no one from Domino's instructed Dawson or the Robizza employees on how to meet or exceed those standards on a daily basis, and Dawson and his wife alone supervised Robizza's employees.

Also testifying[3] was Joseph Deveraux (Deveraux), Domino's Director of Franchise Services from 1997 to present. His job duties included enforcement of the Standard Franchise Agreement with franchisees who were not in compliance. He also signed the Standard Franchise Agreement with Robizza on behalf of Domino's on August 15, 2006. He stated that in some respects the Standard Franchise Agreement gave Domino's the right to create, at any time, specifications, standards and operating procedures and rules for franchises. However, he noted that provisions in the franchise agreement specify that any determinations that Domino's makes under the Standard Franchise Agreement must be reasonable ones.

Deveraux also testified that the Operating Standards issued in July 2016 created mandatory rules for the preparation and sale of all pizza by franchisees. Regarding delivery drivers, he stated that the Operating Standards provided that before a franchisee could hire or train a delivery driver, that driver would have to meet the requirements set forth by the Operating Standards.

January Shook (Shook), an area leader for Domino's Pizza LLC in 2016, also testified.[4] One of her responsibilities was to make sure that the franchisees complied with the Standard Franchise Agreement. It was also her

---

[3] R. 1925-61a.

[4] R. 1925-2113a.

job to understand the Standard Franchise Agreement and ensure that franchisees like Robizza complied with its terms. Her testimony was consistent with that of other witnesses.

Shook testified that, under Section 15.1(d) of the Standard Franchise Agreement, Domino's had the right to create mandatory rules on the methods and procedures relating to receiving, preparing and delivering customer orders. Under Section 15.1(e), (f) and (g), Domino's had the right to create mandatory rules that franchisees, including Robizza, had to follow regarding store hours, the appearance of the interior and exterior of the store and handling of customer complaints. Moreover, if Domino's changed its Operating Standards or Product Standards, she stated that the franchisee would be required to comply with the new standards even though they were not in place when they signed the agreement. She also testified that no one from Domino's visits a franchisee store on a daily, weekly or monthly basis. Although she knew that this case involved a Robizza employee who was involved in an accident, she never met or spoke to him. She did not know who trained the employee, how deliveries were assigned to Morris, or how routes or deliveries were selected for him.

Dawson, the owner of the franchise, testified[5] that he operated Robizza as an independent business. He stated that Robizza was solely responsible

---

[5] R. 1691-1751a; R. 1757-1808a.

for running, managing, supervising, and controlling the methods, means and details of the Store's day-to-day operations. He stated that Robizza independently leased the Store premises, owned or leased all of the equipment used in the Store, and purchased its own ingredients and supplies. The Store's food products were made in ovens and other equipment that it owned and were sold at prices it set. He stated that Robizza paid all of its own bills, expenses and taxes without any involvement of Domino's.

Regarding employment and supervision of employees, Dawson testified that under the Standard Franchise Agreement, Robizza was solely responsible for recruiting, hiring, training, scheduling, supervising, and paying all of its employees, and that Domino's had no contractual right to supervise or direct Robizza's employees. Dawson also testified that a Domino's representative was present in the Store only three to five times a year for approximately an hour at a time for a quality review. During those three to five hours per year, Domino's did not direct, supervise, or correct Robizza's employees.

As to the delivery operation, he stated that Domino's did not monitor the orders that Robizza accepted for delivery, which employees of Robizza were assigned for delivery, or the routes taken by Robizza's employees to complete a delivery. Rather, Domino's merely required that, at a minimum, Robizza take steps to ensure that its employees make all deliveries in compliance with all applicable laws and rules of the road and with due care and caution. Robizza was responsible for training and supervising its

employees to meet or exceed that standard. He stated that the vehicle involved in the accident was leased to him individually and was operated by Morris with his permission. Domino's never inspected, drove, or maintained that vehicle, nor did it train or test any of Robizza's drivers.

## C.

Domino's moved for compulsory nonsuit at the close of the Coryells' evidence, reasserting that the trial court should determine vicarious liability as a matter of law. Again, however, the trial court denied the motion and submitted to the jury whether Domino's should be held vicariously liable. The jury found that (1) Morris negligently caused the accident, (2) Domino's was vicariously liable, and (3) Coryell sustained damages in the amount of $2,009,553 and that his wife was entitled to $100,000.

Domino's subsequently moved for JNOV. The trial court denied the motion and granted delay damages, bringing the total award to $2,337,279.14. Domino's then filed post-trial motions which argued, in relevant part:

> 11. Thus, the question presented to the jury was whether the written provisions of the parties' Standard Franchise Agreement gave Domino's the right to exercise such control.
>
> 12. When the Court denied Domino's motion for nonsuit, the jury was left to engage in the construction of the franchise agreement without the benefit of having (a) the franchise agreement to review, (b) the relevant legal authorities setting forth the standard for vicarious liability in the franchise context, or (c) the legal training to make such a determination of law.

13. The jury was thus asked to make a ruling on a pure question of law that it was ill-equipped to do, and which was within the sole province of the Court to decide. ***See Nat. Prods. Co. v. Atlas Fin. Corp.***, 364 A.2d 730, 733 (Pa. Super. 1975) ("The function of contract interpretation and construction is a question of law peculiarly within the province of the court").

14. Plaintiffs have taken the position throughout this case that the construction of the agreement is a function that should be exclusively performed by the Court, and Plaintiffs themselves moved for summary judgment on the grounds that the interpretation of the franchise agreement is a question of law for the Court to decide.

(R. 1489-90a).

Following entry of judgment on the verdict, Domino's filed this appeal challenging the trial court's denial of its (1) motion for summary judgment, (2) motion for compulsory nonsuit[6] and (3) post-trial motion for JNOV.

## II.

The first issue we must decide is what decision of the trial court we are reviewing: the denial of the motion for summary judgment or the denial of the post-trial motion for JNOV. At the core of this issue is whether the denial of a summary judgment motion can be addressed after the case has proceeded to trial and a judgment has been entered.

---

[6] Domino's challenge to the denial of compulsory nonsuit is moot because it presented evidence after its motion was denied. ***See Tong-Summerford v. Abington Mem. Hosp.***, 190 A.3d 631, 640 (Pa. Super. 2019) ("[W]here a defendant presents evidence following the denial of a motion for nonsuit, the correctness of the trial court's denial is rendered a moot issue and unappealable.") (citation omitted).

While this issue had not been directly addressed, we note that there have been several times when we have reviewed the merits of challenges to the denial of summary judgment after trial has been held. *See Windows v. Erie Ins. Exch.*, 161 A.3d 953, 957 (Pa. Super. 2017) (reviewing merits of denial of pretrial motion for summary judgment after jury verdict); *Krepps v. Snyder*, 112 A.3d 1246, 1257-60 (Pa. Super. 2015) (same); *see also Hempt Bros. v. Allan A. Myers, L.P.*, 266 A.3d 661, 2021 WL 5013745, *5 n.11 (Pa. Super. Oct. 28, 2021) (unpublished memorandum) (citing *Windows* as support for reviewing merits of challenge to pretrial denial of summary judgment); *Brownlee v. Home Depot U.S.A., Inc.*, 241 A.3d 455, 2020 WL 6197405, *3-4 (Pa. Super. Oct. 22, 2020) (unpublished memorandum) (declining to find challenge to pretrial denial of summary judgment was moot).[7]

Very recently, though, a panel of this Court held that "where summary judgment is denied and **the same claim** then proceeds to trial, post-trial and appellate review must focus on whether [JNOV] is required, not on whether summary judgment or nonsuit were improperly denied." *Turnpaugh Chiropractic Health & Wellness Ctr., P.C. v. Erie Ins. Exch.*, 297 A.3d 404, 412 (Pa. Super. 2023) (emphasis in original) (citing *Yoder v. McCarthy*

---

[7] *See* Pa. R.A.P. 126(b) (non-precedential decisions filed after May 1, 2019 may be cited for their persuasive value).

***Constr., Inc.***, 291 A.3d 1, 13 n.15 (Pa. Super. 2023)). ***Yoder***, however, did not hold that review of a denial of summary judgment order was never available. ***Turnpaugh*** though suggests that ***Yoder*** created a hard and fast rule when it did not.

Identifying disparate treatment of this issue in cases such as ***Windows*** and ***Yoder***, we stated in ***Turnpaugh*** that the inconsistency in our review of a denial of a summary judgment motion following a trial should be resolved. However, this is not the case for that resolution. It would be unfair to the instant parties to decline to consider the appeal from the improper denial of the summary judgment when our case law is admittedly inconsistent and confusing. This is especially true since the Motion for Summary Judgment was denied on May 26, 2020, the appeal docketed on October 7, 2021, and Domino's brief was filed June 14, 2022. Thus, Domino's developed its argument on this issue well before ***Turnpaugh*** and ***Yoder*** were decided in 2023, which together added to and highlighted the confusion and inconsistency in this area. Domino's should not be held to a recently-emerging standard on when this Court should review the denial of a motion for summary judgment when, at the time of the relevant proceedings here, cases such as

***Windows*** and ***Krepps*** allowed it to defer an appeal of the denial of summary

judgment until after the case proceeded to trial.[8]

_____

[8] The dissent finds that the majority's position that it would be unfair to deny review of the denial of summary judgment because existing case law permitted such review is baseless because (1) no right to review is lost here and (2) it encourages litigants to ignore countervailing precedent. However, that reasoning is fundamentally flawed. First, under the dissent's position, the right to review the denial of summary judgment as a legal issue is lost. Second, ignoring that we created the problem with our inconsistent case law, Domino's did not ignore countervailing case anymore that we did in issuing purportedly inconsistent opinions, especially when that inconsistency was not highlighted until ***Turnpaugh*** and ***Yoder***, both of which were decided after the summary judgment motion was decided and the briefs in this appeal were filed. Finally, in ***Yoder***, we did not find that all summary judgment denials could not be reviewed, only those involving sufficiency of the evidence. This case, however, does not involve a sufficiency of the evidence claim.

The dissent also posits that because Domino's did not seek permission to appeal the denial of summary judgment under 42 Pa.C.S, § 702(b) and proceeded to trial, that made Domino's pretrial claim became moot. This is wrong for so many reasons.

First, to reiterate, this is not a sufficiency claim which involves evidence; this is a claim that the contract should be decided by the judge as a matter of law and over which we have plenary review.

Second, an appeal under 42 Pa.C.S, § 702(b) is a permissive appeal and, by definition, only allowed if it involves an important issue and will aid in determination of the case. No one has ever suggested that because a party does not seek to appeal under § 702(b), that the issue for which an appeal could have been sought somehow becomes moot. The consequence of the dissent's position is that an appeal of an adverse interlocutory order would have to be sought to avoid an issue becoming moot.

Third, the dissent seems to infer that if a § 702(b) appeal is sought and denied, then the issue is not waived and we can the address the denial of summary judgment once a final judgment has been entered. This would only add to the confusion of what we can review, however.

J-A26040-22

# III.

## A.

Whether we review this appeal from the denial of the summary judgment motion or from the denial of the post-trial motion is of no moment if the question of whether Domino's was vicariously liable should have been decided as a question of law by the trial court. Unlike the issue of whether denial of a summary judgment can be reviewed after trial, the law is clear and well-settled on how to review disputes involving contracts.[9]

_____

Fourth, in the alternative, if we cannot address the issue if a § 702(b) appeal is denied, then that makes the summary judgment denial a collateral order which allows for an appeal as of right under Pa.R.A.P 313 since the issue will be irreparably lost if review is postponed until final judgment because, in the dissent's view, it is moot.

In any event, because the contract is unambiguous, the trial court should have decided whether Domino's was vicariously liable as a matter of law and not allowed the issue to go to the jury.

[9] Notwithstanding the well-settled principle that the interpretation of an unambiguous contract is legal question, the dissent, to achieve its outcome, creates a new standard that contract review in the franchisor-franchisee context is a mixed question of fact and law. None of the cases the dissent cites on this point involve contract interpretation. It compounds that error by misapplying that standard by saying the issue of vicarious liability here leans to being a factual issue when there are no facts in dispute in this case. Not surprisingly, just like the cases involving its mixed question of fact and law, none of the cases the dissent cites involving when vicarious liability was determined by the factfinder deal with whether the contract creates the master-servant relationship but even those cases provide that "where the facts giving rise to the relationship are not in dispute, the question of the relationship between the parties is one which is properly determined by the court." **Breslin v. Ridarelli**, 454 A.2d 80, 82 (1982). The terms of the Standard Franchise Agreement are not in dispute.

- 15 -

In **Kripp v. Kripp**, 849 A.2d 1159 (Pa. 2004), our Supreme Court reiterated that when a contract is unambiguous it must be interpreted as a matter of law:

> In cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are to be given their ordinary meaning. **Pines Plaza Bowling, Inc. v. Rossview, Inc.**, 394 Pa. 124, 145 A.2d 672 (1958). When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. **Hutchison v. Sunbeam Coal Corp.**, 513 Pa. 192, 519 A.2d 385, 390 (1986). When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. **Steuart v. McChesney**, 498 Pa. 45, 444 A.2d 659, 663 (1982); **Herr's Estate**, 400 Pa. 90, 161 A.2d 32, 34 (1960). A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. **Hutchison**, 519 A.2d at 390. While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact. **Community College v. Society of the Faculty**, 473 Pa. 576, 375 A.2d 1267, 1275 (1977).

**Id.** at 1163; **see also Nat. Prods. Co. v. Atlas Fin. Corp.**, 364 A.2d 730, 733 (Pa. Super. 1975) ("The function of contract interpretation and construction is a question of law peculiarly within the province of the court").

**Accord Green v. Independent Oil Co.**, 201 A.2d 207, 211 (Pa. 1964); **Myszkowski v. Penn Stroud Hotel, Inc.**, 634 A.2d 622, 625 (Pa. Super. 1993); **Mitch v. XTO Energy, Inc.**, 212 A.3d 1135, 1138 (Pa. Super. 2019) ("It is settled that because contract interpretation is a question of law, our review of the trial court's decision is *de novo* and our scope of review plenary."); **Mutual Benefit Ins. Co. v. Politopoulos**, 75 A.3d 528, 535 n.5

(Pa. Super. 2013) ("In resolving a duly raised question of contract interpretation, we face a question of law, which triggers our *de novo* standard of review."); ***Juarbe v. City of Philadelphia***, 431 A.2d 1073, 1076 (Pa. Super. 1981). Moreover, "the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question [the reviewing court's] standard of review is *de novo*." ***Summers v. Certainteed Corp.***, 997 A.2d 1152, 1159 (Pa. 2010).

In an appeal involving the review of trial court's summary judgment[10] motion involving vicarious liability, we stated:

> In an action to recover damages vicariously for injuries resulting from an automobile accident, it is necessary for the plaintiff to prove not only that the driver was the defendant's servant, but that such servant was at the time engaged in his master's

---

[10] When reviewing such a ruling by the trial court on summary judgment:

> [O]ur scope of review is plenary, and our standard of review is the same as that applied by the trial court.
>
> * * *
>
> [O]ur responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a *prima facie* cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied. With respect to the denial of summary judgment, we review the trial court's denial of summary judgment for an abuse of discretion or an error of law.

***Windows v. Erie Ins. Exch.***, 161 A.3d 953, 956-57 (Pa. Super. 2017) (alterations in original) (internal quotations omitted).

- 17 -

business.  A servant, in law, is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.  It is not. . . the fact of actual interference or exercise of control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor.  It is the exclusive function of the jury to determine, from the evidence, the precise nature of the relationship, **except where the facts are not in dispute, in which latter event the question becomes one for determination by the court**.

*Melmed v. Motts*, 491 A.2d 892, 893 (Pa. Super. 1985) (internal citations and quotations omitted) (emphasis added).

The issue we must then decide is whether the Standard Franchise Agreement is unambiguous, requiring the trial court to decide whether Domino's was vicariously liable under its provisions.

**B.**

The answer at the summary judgment stage was easy: all the parties agreed that the Standard Franchise Agreement was unambiguous.  In its motion for summary judgment, Domino's attached affidavits from Dawson, owner of Robizza, and Devereaux, Domino's Director of Franchise Services. *See* Motion for Summary Judgment, 3/2/20, Exhibit D (Devereaux Affidavit, 2/27/20, R. 303a-309a) and Exhibit E (Dawson Affidavit, 2/26/20, R. 379a-384a).  In their affidavits, both Dawson and Devereaux rejected that the franchise agreement created a master-servant relationship between Domino's and Robizza; instead, they stated that the two parties were independent contractors under the franchise agreement.  Domino's argued that the

underlying facts were not in dispute because, "[t]he record is driven by the testimony of the two parties to the franchise relationship (via Mr. Dawson and Mr. Devereaux) and the terms of the Franchise Agreement." Memorandum of Law in Support of Summary Judgment, 3/2/20, at 8, R. 186a. Because the terms of the underlying agreement were not in dispute, and the agreement controlled the franchise relationship, Domino's argued that the trial court and not a jury should determine vicarious liability. *Id*. (citations omitted).

The Coryells responded that "[t]he relationship between Robizza and Domino's is controlled by their [franchise agreement]." Response to Summary Judgment Motion, 5/11/20, ¶ 14, R. 392a. They disavowed, however, Domino's attempts to rely on affidavits for its construction of the agreement. As they explained, because the franchise agreement was unambiguous and controlled the argument, "any affidavit created only for the purpose of this litigation that attempts to interpret that contract or otherwise characterize Robizza and Domino's relationship should be afforded no weight." *Id*. While still asserting that the franchise agreement created a master-servant relationship as a matter of law, the Coryells nonetheless conceded that "classifying the relationship formed by the Franchise Agreement is a matter of contract interpretation for [the trial court]." Memorandum of Law in Response to Summary Judgment, 5/11/20, at 5, R. 421a.

Moreover, in responding to the motion, the Coryells offered no evidence outside the agreement about the actual practice of Domino's and Robizza

under their franchise agreement. Instead, they attached the deposition of Shook, a Domino's corporate employee who used to be the area leader for Robizza. *See* Response to Summary Judgment Motion, 5/11/20, Exhibit D (January Shook Deposition, 1/24/20, R. 579a-602a). They also included an expert report from Jones, a former Domino's executive. *Id*. Exhibit T (Roy Jones Expert Report, 4/16/20, R.927a-941a). According to the Coryells, both Shook's deposition and Jones's report showed that Domino's understood that its franchise agreement with its franchisees gave it the right to create mandatory rules affecting the daily operations of its stores. *Id*. ¶¶ 75-81, ¶¶ 84-87, R. 411a-413a. In so arguing, however, the Coryells still admitted that issues of contract interpretation are for the trial court to resolve. *Id*. ¶ 87, R. 413a.

At this stage of the proceedings, neither Domino's nor the Coryells claimed that there was any factual dispute about the nature of the relationship between Domino's and Robizza or that the contract was unambiguous. Rather, the parties simply disagreed over how the franchise agreement should be construed. Such disagreements about construction of a contract's terms should not impede disposition of the parties' claims on summary judgment. *See Pappas v. UNUM Life Ins. Co. of Am.*, 856 A.2d 183, 187 (Pa. Super. 2004). As a result, while ambiguous contracts are interpreted by the finder of fact, unambiguous contracts are interpreted by the trial court as a matter of law. *See Kripp*, *supra,* at 1163.

Consistent with these principles where the sole evidence of the relationship between the parties is found in an agreement and where the terms of the agreement are not in dispute, it is the function of the trial court and not the jury to determine the relationship between the parties. **See Green**, **supra**, at 210 (holding trial court erred in submitting to the jury the question of the relationship of the parties where sole evidence was their agreement). Accordingly, the trial court erred in not deciding the matter at summary judgment stage as a matter of law.

**C.**

Unlike their argument at the summary judgment stage, the Coryells now contend that there was a factual dispute that needed to be resolved by the jury. They emphasize that Domino's was given the chance at trial and after the jury's verdict to reassert the arguments that it raised at the summary judgment stage. **See** Coryells' Brief at 37. Furthermore, they argue that the evidence at trial was "extensive and consistent" with the arguments at the summary judgment stage. **Id**. They do not mention that at the summary judgment stage, they stated that the matter should be decided as a matter of law by the trial court. However, whether the evidence at trial was consistent with their argument at the summary judgment stage that the franchise agreement created a master-servant relationship is immaterial. As we have explained, the issue is whether there was a factual dispute arising out of

ambiguities about the parties' relationship in the Standard Franchise Agreement and Operating Standards.

The Coryells also assert that the imposition of vicarious liability depends on the underlying facts of the franchisor-franchisee relationship, and that the franchise agreement does not determine vicarious liability. *Id*. at 50-51. In support, they cite ***Drexel v. Union Prescription Centers, Inc.***, 582 F.2d 781 (3d Cir. 1978). There, the Third Circuit observed "[w]hether the control retained by the franchisor is also sufficient to establish a master-servant relationship depends in each case upon the nature and extent of such control as defined in the franchise agreement or by the actual practice of the parties." ***Id***. at 786.

However, neither party at trial disputed the terms of the Standard Franchise Agreement or the Operating Standards. As our discussion of their provisions later in this opinion shows, the testimony of all witnesses merely recounted what the Agreement stated and what they thought those provisions meant. Moreover, none of the witnesses testified that the "actual practice of the parties" varied in any way from the terms of the Standard Franchise Agreement or Operating Standards. Jones, Devereaux, and Shook all testified that they believed that Domino's had the right under the Franchise Agreement to set standards that Robizza was mandated to follow. Jones testified to the franchisee's obligations under the Standard Franchise Agreement and Operating Standards. His testimony does not vary from the terms of those

documents and he stated that those terms were enforced. Devereaux and Shook testified that Domino's exercised its contractual rights by adopting not only product standards to ensure the quality of food associated with the Domino's brand, but also operating standards that mandated how Robizza operated its store. Those standards could be changed by Domino's at any time and Domino's issued Operating Standards in July 2016 that governed the day-to-day operations of the Store. That is certainly what the Standard Franchise Agreement provides.

The only purpose of presenting that evidence at trial was to present a narrative of the terms of Standard Franchise Agreement and Operating Standards and what control those provisions gave Domino's over Robizza. Just like at the summary judgment stage, the Coryells did not dispute that the Standard Franchise Agreements or Operating Standards were unambiguous but relied on their unambiguous nature to contend that those documents were sufficient alone to impose vicarious liability. Because the Standard Franchise Agreement and Operating Standards were unambiguous, the trial court erred, not only in not deciding the matter on summary judgment, but also in submitting this question of law to the jury to determine whether Domino's was vicariously liable.

**IV.**

Having determined that the issue of vicarious liability should have been determined by the trial court as a matter of law, we turn to the second issue:

whether Domino's could be held vicariously liable under its Standard Franchise Agreement.[11]   Under Pennsylvania law, a franchisor can be held vicariously liable for the negligence of a franchisee's employees if it exercises such control over the franchisee that it is tantamount to a master-servant relationship.

> In the context of vicarious liability, a principal is liable to third parties for the frauds, deceits, concealments, misrepresentations, torts, negligent acts and other malfeasances of his agent, even though the principal did not authorize, justify, participate in or know of such conduct or even if he forbade the acts or disapproved of them, as long as they occurred within the agent's scope of employment.

***Travelers Cas. & Sur. Co. v. Castegnaro***, 772 A.2d 456, 460 (Pa. 2001).

_____

[11] This issue implicates a pure question of law for which our standard of review is *de novo*.  ***Riemenschneider v. D. Sabatelli, Inc.***, 277 A.3d 612, 614 (Pa. Super. 2022) (citation omitted).

We note that our review also implicates principles of contract interpretation. "Since contract interpretation is a question of law, our review of the trial court's decision is *de novo* and our scope is plenary." ***Bair v. Manor Care of Elizabethtown PA, LLC***, 108 A.3d 94, 96 (Pa. Super. 2015) (citation and quotation marks omitted).  The goal of contract interpretation is to "ascertain the intent of the parties." ***Lenau v. Co-eXprise, Inc.***, 102 A.3d 423, 429 (Pa. Super. 2014).

> In the cases of a written contract, the intent of the parties is the writing itself.  If left undefined, the words of a contract are to be given their ordinary meaning.  When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself.

*Id*. at 429 (internal citations omitted).  In the absence of any ambiguity in the terms of a contract, a court is not permitted to consider parol evidence, or any other extrinsic evidence, to ascertain the intent of the parties.  *Id*. The dissent in footnote 3 misconstrues the majority position.

Not all agents, though, are deemed "employees" or "servants." Rather, "[a] principal and agent can be in the relationship of a master and servant, or simply in the status of two independent contractors." **Myszkowski**, **supra**, at 625 (internal quotation marks omitted). "If a particular agent is not a servant, the principal is not considered a master who may be held vicariously liable for the negligent acts of the agent." **Id**. (internal quotation marks omitted).

In deciding whether a relationship is one of master-servant or independent contractors, our Supreme Court has explained the basic inquiry

> is whether such person is subject to the alleged employer's control or right to control with respect to his physical conduct in the performance of the services for which he was engaged. . . . **The hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the manner in which the work shall be accomplished**; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result.

**Green**, **supra**, at 210 (citation omitted) (emphasis added).

Further, "the mere existence of a franchise relationship does not necessarily trigger a master-servant relationship, nor does it automatically insulate the parties from such a relationship." **Drexel**, **supra**, at 786. As the Third Circuit has noted, no special treatment is given to the franchise relationship, as a franchisee may be an employee or an independent contractor depending on the nature of the franchise system controls.

***Williams v. Jani-King of Philadelphia, Inc.***, 837 F.3d 314, 325 (3d Cir. 2016).

While it has been nearly 30 years, this Court's decision in ***Myszkowski*** remains our most germane precedent on vicarious liability in the franchisor-franchisee context. There, the appellant was attacked in the restroom of the Penn Stroud Hotel (Penn Stroud), a franchisee of Best Western International, Inc (Best Western). The appellant filed an action alleging that Best Western was vicariously liable for Penn Stroud's negligence because it exercised or retained the right to control the hotel's operations under their marketing agreement. Under their agreement, Penn Stroud was permitted to use the "Best Western" name and participate in its reservation network. Best Western moved for summary judgment and claimed that it did not have an agency relationship with Penn Stroud. The trial court agreed and entered summary judgment in Best Western's favor. The appellant appealed and argued that there was an agency relationship because Best Western concerned itself with Penn Stroud's operations "through the workshops and programs it conducts, the rules and regulations it imposes and its ability to sanction for noncompliance with its quality standards." ***Myszkowski***, ***supra***, at 625.

On appeal, this Court affirmed the grant of summary judgment. We first recognized that, as quoted above in ***Green***, "the hallmark of a master-servant relationship is that the master possesses the right to control the *manner* in which the servant's work shall be accomplished." ***Id***. at 626 (emphasis in

- 26 -

original). We found, however, that Best Western did not control how Penn Stroud accomplished its work simply by having a marketing agreement with the hotel. Instead, quoting the Second Restatement of Agency, we stated, "[i]t is the element of *continuous subjection* to the will of the principal which distinguishes the ... agency agreement from other agreements." *Id*. (quoting RESTATEMENT (SECOND) OF AGENCY, § 1(1), comment b (1957) (emphasis added by panel)).

We then observed that there was no Pennsylvania case law defining the inquiry for determining actual agency "in this context," presumably meaning franchisor vicarious liability. As a result, we adopted a standard that several other states had adopted. Under this standard, the focus of the inquiry is on "whether the alleged master has day-to-day control over the manner of the alleged servant's performance." *Id*. (citations omitted).

As support for adopting this standard, we discussed our Supreme Court's decision in *Green*, characterizing it as the seminal case on this issue. *Id*. In *Green*, we noted, the Supreme Court held that a trial court erred in submitting to a jury the relationship between an oil company and one of its franchisee/dealers. *Id*. In so holding, the Supreme Court considered "(1) the agreement between the parties specifically disclaimed the existence of an agency relationship; (2) all profits went to the dealer; (3) the sales tax permits and the electric bills were in the dealer's name; (4) the dealer hired and fired his own employees and paid them; (5) all monies were kept in the dealer's

personal bank account; and (6) the dealer purchased [the oil company's] products." *Id*. (citing *Green*, *supra*, at 210). By focusing on these facts, we gleaned that the Supreme Court focused its inquiry "on the extent to which the purported master controlled the day-to-day operations of the alleged servant."

Turning to the agreement between Best Western and Penn Stroud, we explained why Best Western did not control the hotel's daily operations:

> Here, the owners of Penn Stroud managed the day-to-day operations of the business and made all of the decisions incidental to this operation. The employees of the Inn were hired, fired, paid, and supervised by Penn Stroud managers. Penn Stroud managers set the prices for the various services and accommodations they provide. Best Western has no ownership interest in Penn Stroud. To the contrary, one hundred percent of the stock in Penn Stroud is owned by defendant Lee Andrews and the Inn is run by various members of the Andrews family in Stroudsburg; Best Western is only paid a fixed amount each year ($23,500) for its services. Moreover, the agreement between Best Western and Penn Stroud specifically provides that their relationship is one of independent contractor, and that Best Western has, *inter alia,* "no responsibility for the ... safety of the premises." It also affords Penn Stroud the right to voluntarily end its association with Best Western at any time for any reason. For these reasons, there is clearly not the necessary control by Best Western of day-to-day operations to establish a master-servant relationship. *See Green*, [*supra*, at 210].

*Id.* at 626-27.

We also found that no master-servant relationship was created through Best Western's quality control program, its rules and regulations, or its programs and workshops. *Id*. at 627. We explained that "the fact that Best Western sets certain standards in order to maintain a uniform quality of inn

- 28 -

service only addresses the *result* of the work and not the *manner* in which it is conducted." ***Id***. (emphasis in original). While Best Western set the quality criteria, Penn Stroud decided how the criteria were met, which suggested an independent contractor-contractee relationship. ***Id***.

We also attached little import to Best Western's right to terminate Penn Stroud's use of the "Best Western" name if it failed to meet quality control requirements. ***Id***. That Best Western could impose such a sanction, we held, "[did] not indicate that there is continuous subjection to the will of the alleged master so as to constitute a master-servant relationship." ***Id***. (citation omitted). Rather, we found that such a sanction merely reemphasized that Penn Stroud was an independent entity that could voluntarily end its relationship with Best Western when it wanted. ***Id***. (footnote omitted). Indeed, we explained that Best Western could either end its relationship with Penn Stroud or threaten to terminate the relationship—it could not compel Penn Stroud to alter its conduct. ***Id***. As a result, we held that Penn Stroud had daily control of the hotel, as Best Western merely had the threat to revoke use of the trade name. ***Id***. at 628. Thus, as there was no master-servant relationship, Best Western could not be vicariously liable. ***Id***.

After ***Myszkowski***, we have had few occasions to apply its standard in the franchisor-franchisee context. One such occasion happened in ***Smith v. Exxon Corp.***, 647 A.2d 577 (Pa. Super. 1994). There, the appellant was assaulted while working in a mini-mart. ***Id***. at 578. Besides suing the min-

mart's parent company, the appellant also sued Exxon, which had a distributor agreement with the parent company. *Id*. Responding to the allegation that it negligently failed to implement safety measures, Exxon filed preliminary objections asserting that it owed no legal duty to the appellant. *Id*. After the trial court sustained preliminary objections, the appellant appealed. *Id*.

On appeal, the appellant argued that the distribution agreement's provision gave Exxon control over the mini-mart's daily operations. Those provisions included: (1) that the parent company would provide qualified attendants with appropriate uniforms as well as keep the restrooms clean, orderly and sanitary and to render appropriate, prompt, efficient and courteous customer service; (2) Exxon could sample at any time the gasoline stored in the parent company's tanks; (3) the parent company had to use the trademarks in a certain way, protect their identity from non-Exxon products and submit to several courses of action if the trademarks were misused; and (4) the parent company had to comply with a marketing plan to optimize effective distribution of gasoline with Exxon giving comments. *Id*. at 581-82.

In light of our then-recent decision in *Myszkowski*, though, we found that the agreement did not create a master-servant relationship.

> In *Myszkowski*, the marketing agreement afforded quality control requirements for the protection of Best Western's tradename and services. The Distributor Agreement herein provides similar provisions for the purpose of preserving the integrity of Exxon's trademark and the quality of its gasoline, i.e., samples taken from tanks. As in *Myszkowski*, here, standards were implemented to maintain a uniform quality of service. We are of the opinion that the standards concerning the appearance

of personnel and restrooms and the response to customer complaints do not amount to Exxon having control over the manner in which the work is accomplished. Under the guidance of our Court's decision in **Myszkowski**, we also reject appellant's assertion that a marketing plan, as mentioned in [the Distributor Agreement], is indicative of Exxon's control over [the parent company's] business. In comparison to the facts in **Myszkowski**, we find that Exxon's involvement in the operation of [the parent company's] mini-mart is exponentially less than Best Western's involvement with the operation of Penn Stroud. There, the circumstances reveal that Penn Stroud's inn was engaged exclusively in hotel services. The inn obtained guidance from Best Western on how to conduct its business through regulations, programs and workshops that were set up by Best Western. Here, on the other hand, [the parent company's] mini-mart is a convenience store and not merely a gas station. Exxon is only one of many suppliers of products to that store. The record is devoid of facts that even suggest that Exxon played a role in any day-to-day operational decisions of the mini-mart.

*Id*. at 582-83. We thus held that Exxon and the parent company were in an

independent contractor-contractee relationship. *Id*. at 583.[12]

## V.

We now turn to the Standard Franchise Agreement between Domino's

and Robizza to determine whether, under that agreement, Domino's exercised

---

[12] We have found no other precedential opinions applying **Myszkowski** in a franchisor-franchisee context. Domino's cites as support our unpublished memorandum in **Galeone v. Rodeway Inn Ctr. City**, 2021 WL 3126754 (Pa. Super. 2021). There, we found that the appellant waived his challenge to the trial court's vicarious liability determination by failing to cite any pertinent authority. *Id*. at *10-11. However, the franchise agreement in that case not only disavowed any agency relationship but also clarified that the franchisor's oversight was limited to end-result standards and not the manner in which the franchisee conducted the work. *Id*. at *11. As this was the extent of the discussion of the merits of the issue, **Galeone** has no persuasive value here.

such control that a master-servant relationship was created. As we discuss, the franchise agreement between Domino's and Robizza included not only the Standard Franchise Agreement dated August 15, 2006, but also the concomitant Operating Standards issued under that agreement in July 2016.

**A. Standard Franchise Agreement**

In its introduction, the Standard Franchise Agreement states that Domino's "has developed and operates retail outlets specializing in the sale of pizza and other authorized food and beverage products and featuring carry-out and delivery services." Standard Franchise Agreement (SFA), 8/15/16, ¶ 1, R. 466a. These stores conduct business under a "uniform business format, with specially designed equipment and specifications for the preparation and sale of pizza and other authorized food products." *Id*. By entering the franchise agreement, Robizza received a ten-year license to operate a Domino's franchise at the location identified in the franchise agreement. *Id*. ¶¶ 2.1-2, R. 466a-467a. Related to its location, Robizza had a geographic area of responsibility for delivery services. *Id*. ¶¶ 4.1-4.2, R. 468a-469a. When making deliveries, delivery drivers had to "strictly comply with all laws, regulations and rules of the road and due care and caution in the operation of delivery vehicles." *Id*. ¶ 4.2, R. 468a-469a.

During the franchise's term, Robizza paid Domino's a royalty fee of 5 1/2 percent of its weekly sales and contributed three percent for advertising. *Id*. ¶¶ 6.1, 13.1, R. 469a, R.476a. Robizza made these payments from its

own bank account unless Domino's made it participate in a program under which payments were automatically withdrawn from Robizza's account. *Id*. at ¶ 6.4, R. 470a. Robizza also had its own bookkeeping system and retained all business records and reports for the store, *id*. ¶ 14.1, R. 478a, and filed its own tax returns, *id*. ¶ 15.2, R. 481a.

Robizza leased and obtained the store's premises, although all leases had to be approved by Domino's. *Id*. ¶¶ 7.1, 7.4, R. 471a-472a. Robizza obtained all zoning changes and building permits; purchased or leased the store's equipment, fixtures, furniture and signs; and would also construct the store. *Id*. ¶ 8.1, R. 472a-473s. Robizza could buy the store's equipment "from any source," as long as it met with Domino's specifications. *Id*. ¶ 8.2, R. 473a. Robizza also obtained and maintained its own property and liability insurance. *Id*. ¶ 15.7, R. 482a-483a.

As for employment matters, Robizza hired, trained, scheduled, supervised and paid the store's employees. *Id*. ¶ 15.6, R. 482a. These employees, the franchise agreement stated, were not Domino's "agents or employees." *Id*. Domino's had "no legal right to direct [Robizza's] employees in the operation of the Store," as "[t]hose functions remain [Robizza's] sole responsibility and duty." *Id*. ¶ 11.1, R. 475a. For employee training, Robizza had to implement its own program for "training the employees to legally, safely and perform his or her duties while inside the Store and while outside Store for business purposes[.]" *Id*. ¶ 10.2, R. 474a.

Robizza would offer for sale "all pizza and other authorized food and beverage products" and provide carry-out and delivery services. *Id*. ¶ 12.1, R. 475a-476a. To make the food, however, Robizza was responsible for buying all "food ingredients, beverage products, cooking materials, containers, packaging materials, utensils, uniforms, menus, forms, and cleaning and sanitation materials." *Id*. ¶ 12.2, R. 476a.

The store always had to be under the "direct, on-premises supervision" of the franchise owner (Dawson) or an approved properly-trained manager. *Id*. ¶ 15.6, R. 482a. Domino's could inspect the store at any time during business hours without notice. *Id*. ¶ 17, R. 485a. Domino's also could also terminate the franchise agreement under certain enumerated conditions with written notice, though Robizza could correct the condition within a specified period. *Id*. ¶ 18.2.1-18.2.2, R. 485a-487a.

Finally, as mentioned, the franchise agreement provided that Domino's and Robizza "are independent contractors" and that no training, assistance or supervision that Domino's gave would "be deemed to negate such independence or create a legal duty on our part." *Id*. ¶ 22.8, R. 499a-500a. To that end, Domino's would not be liable for "any damages to any person or property arising directly or indirectly out of the operation of the Store, including but not limited to those damages which may occur while your employees are making or returning from making deliveries[.]" *Id*. R. 499a.

## B. Operating Standards

The Standard Franchise Agreement also contained a section on "Operating Requirements." Under this section, Robizza had to comply with Domino's "specifications, standards and operating procedures" concerning various aspects of the store's operations. *Id*. ¶ 15.1, R. 480a-481a. These included (but were not limited to) the following:

(a) the safety, maintenance, cleanliness, sanitation, function and appearance of the Store premises and its equipment, image, fixtures, furniture, décor and signs;

(b) qualifications, dress, grooming, general appearance and demeanor of [Robizza's employees];

(c) quality, taste, portion control and uniformity, and manner of preparation and sale, of all pizza and other authorized food and beverage products sold by the Store and of all ingredients, supplies and materials used in the preparation, packaging and sale of these items;

(d) methods and procedures relating to receiving, preparing and delivering customer orders;

(e) the hours during which the Store will be open for business;

(f) use and illumination of exterior and interior signs, posters, displays, menu boards and similar items;

(g) the handling of customer complaints;

(h) advertising on the internet or other electronic media, including websites, homepages and the use of domain names;

(i) e-mail capabilities of the Store and other electronic communication devices to facilitate communication with [Domino's]; and

(j) the method and manner of payment which will be accepted from customers.

*Id*. ¶ 15.1(a)-(j), R. 480a-481a. Robizza agreed "to abide by these specifications, standards, operating procedures and rules and to fully adopt and implement them." *Id*. R. 481a.

These standards were laid out in more detail in a separate manual, the provisions of which were considered as if contained in the franchise agreement. *Id*. ¶ 15.4, R. 481a-482a. At the time of the accident, the most current version of the operating standards had just been issued in July 2016. In its introduction, the standards state that they set minimum guidelines

> under which all Domino's pizza stores will operate in order to assure a uniform, high-quality customer experience, regardless of where the store is located, that promotes and protects the Domino's Pizza brand and trademarks for the mutual benefit of all stakeholders and, in other cases suggested procedures which franchisees may choose to use in operating their stores. . . . As independent business owners, franchisees have both the right and responsibility to establish policies and procedures that meet the Standards. Further, franchisees may choose, from time to time, to establish and follow procedures that are more strict than the Standards.

Operating Standards at 1, R. 556a.

The standards then set guidelines for an array of areas involving how franchise stores operate. Focusing first on those provisions relating to hiring employees, the standards provided that "[i]n order to protect the integrity, public perception, and reputation of the Domino's brand, trademarks, and goodwill," franchisees needed to follow a "minimum standard" on conducting criminal background checks. *Id*. at 11, R. 566a. In so doing, franchisees were "solely responsible for making hiring and other employment decisions

for their stores and should consider all relevant factors prior to making an employment decision based upon a criminal history report[.]" ***Id***. at 12, R. 567. Beyond this, though, the standards merely required that the franchisee make all employment decisions "in accordance with applicable laws, statutes, codes, ordinances, regulations and rules." ***Id***. After hiring its employees, franchisees were "solely responsible for. . . all employment practices and policies, all safety and security issues, and all other workplace issues." ***Id***. Consistent with that, franchisees agreed to implement their own training program for their employees with certain minimum topics, including delivery safety. ***Id***.

Turning to delivery services, the standards contained a similar provision to that in the Standard Franchise Agreement requiring that "[a]ll deliveries must be made in strict compliance with all applicable laws, statutes, code, ordinances, regulations, rules of the road, and due care and caution in the operation of delivery vehicles." ***Id***. at 17, R. 572a. Stores had to offer delivery service during approved hours of operation to all customers within the store's service area. ***Id***.

The standards set out "minimum motor vehicle record standards" for franchisees to follow in hiring delivery drivers. ***Id***. at 20, R.575a. These minimum standards included that the driver have a valid state driver's license; proof of automobile liability insurance meeting state minimum requirements; and that their motor vehicle record be evaluated at the start of employment

and every six months after hiring. *Id*. For the driver's motor vehicle records, the standards disqualified certain persons to be delivery drivers who had some driving-related violations (such as speeding, failure to stop or obey traffic signal/device) or at-fault accidents. *Id*. at 21, R. 576a. Similarly, the standards prohibited delivery drivers from having more serious violations in the three years before being hired; these violations included, among others, leaving the scene of an accident, reckless driving, DUI or vehicular assault. *Id*. The standards also provided that delivery vehicles needed to be inspected periodically and could not show excessive damage or wear and tear, with the interior being kept reasonably clean. *Id*. at 21-22, R. 576a-577a. When making deliveries, drivers had to wear seat belts and could not use a cell phone while driving. *Id*. at 22, R. 577a. Drivers also could not have passengers with them on deliveries unless that passenger was approved store personnel. *Id*.[13]

_____

[13] Besides the operating standards, the franchise agreement included a document entitled Domino's Product Standards, dated September 1, 2015. *See* R. 505a-551a. Whereas the operating standards involved the store's operations, the product standards gave specific instructions about not only the storage and handling of food products but also how the food products should be prepared. Concerning the latter, the product standards provided step-by-step instructions to the store's employees about how to make the pizza and food products, detailing even what fingers and movements should be used in making the food.

**VI.**

We finally come to our discussion of whether the franchise agreement created a master-servant relationship between Domino's and Robizza, thus making Domino's vicariously liable for the Coryells' damages.

Domino's contends that the relationship between it and Robizza under the franchise agreement is like that in all business-format franchises which require the franchisee to follow a system of standards and procedures. These system-wide standards, it argues, provide a way to protect the trademarked brand at great distance. "The goal—which benefits both parties to the contract—is to build and keep customer trust by ensuring consistency and uniformity in the quality of goods and services, the dress of franchise employees, and the design of the stores themselves." Domino's Brief at 34-35 (citation omitted). It argues that under that arrangement, there is no evidence that it had daily control of Robizza's operation of its business. The Coryells, meanwhile, contend that the franchise agreement and attendant operating standards were so all encompassing that Domino's controlled the day-to-day actions of Robizza and its personnel to such an extent that it created a master-servant relationship and made it vicariously liable for the negligence of Robizza's employees.

At the outset, we reiterate that our standard in this context is whether the franchisor has day-to-day control over how the franchisee accomplishes their work. ***Myszkowski***, ***supra***, at 626. As one of our sister jurisdictions

remarked in adopting this standard, this is the traditional approach for analyzing franchisor vicarious liability, as it strikes a balance between vicarious liability and federal trademark analyses.

> This approach recognizes that, while the vicarious liability and Lanham Act[14] analyses involve an element of "control," the inquiries are distinct. To protect its trademark, a franchisor "must retain sufficient control over the licensees' dealings in the *end product* to insure that they will apply the mark to either the same product or to one of substantially the same quality with which the public in the past has associated the product." Conversely, the vicarious liability "right to control" test focuses on a franchisor's control over a franchisee's performance of its day-to-day operations.
>
> …The traditional test allows a franchisor to regulate the uniformity and the standardization of products and services without risking the imposition of vicarious liability. If a franchisor takes further measures to reserve control over a franchisee's performance of its day-to-day operations, however, the franchisor is no longer merely protecting its mark, and imposing vicarious liability may be appropriate.

*Rainey v. Langen*, 998 A.2d 342, 348-49 (Me. 2010) (internal citations omitted; footnote added).[15]

---

[14] 15 U.S.C. §§ 1051-1141n.

[15] The traditional "right to control" test stands in contrast to narrowly tailored instrumentality test adopted in other jurisdictions. Under that approach, the franchisor may be held vicariously liable for the tortious conduct of its franchisee only if the franchisor controlled or had a right of control over the daily operation of the specific aspect of the franchisee's business that allegedly caused harm. *See*, *e.g.*, *Kerl v. Dennis Rasmussen, Inc.*, 682 N.W.2d 328, 341 (Wis. 2004); *Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 55 (Ky. 2008); *VanDeMark v. McDonald's Corp.*, 904 A.2d 627, 636 (N.H. 2006); *Lind v. Domino's Pizza, LLC*, 37 N.E.3d 1, 6-7 (Mass. App. Ct. 2015).

Daily control of the franchisee's operations remains necessary for the imposition of vicarious liability. Thus, even though a franchise agreement may have many requirements and standards for operating the store, that is not the type or degree of "control" necessary to support vicarious liability under the controlling case law in Pennsylvania. *See*, *e.g.*, *Myszkowski*, *supra*, at 627 ("standards in order to maintain a uniform quality of inn service only addresses the result of the work and not the manner in which it is conducted"); *Smith v. Exxon Corp*., 647 A.2d 577, 582-83 (Pa. Super. 1994) (standards for product quality, store appearance, appearance of personnel and how to respond to customer complaints to preserve Exxon's trademarks did "not amount to Exxon having control over the manner in which the work [was] accomplished.").

As to day-to-day control, we start with looking at employment matters in the franchise agreement and find that Robizza unmistakably had day-to-day control over such matters. As detailed above, under the Standard Franchise Agreement, Robizza recruited, hired, trained, scheduled, supervised and paid all the store's employees. On this point, the franchise agreement stated that the persons who worked in the store were Robizza's employees, and that those persons were not agents or employees of Domino's. Relatedly, the franchise agreement disclaimed that Domino's had any legal right to direct Robizza's employees in the operation of the store. Even when Domino's gave advice or suggestion, the franchise agreement disclaimed that it assumed any

responsibility or duties allocated to Robizza under the franchise agreement. The operating standards only reinforced this, providing that Robizza was responsible for "all employment practices and policies." This included hiring decisions, with the standards requiring criminal background checks, but otherwise giving Robizza discretion in making employment decisions. Taken together, based on these provisions, we have little difficulty in concluding that the franchise agreement ceded day-to-day control over all employment matters to Robizza as the franchisee, thus suggesting an independent contractor-contractee relationship rather than master-servant.

The same holds true for Robizza's control over its delivery drivers, from who could be hired to how they drove their vehicles. As for the former, the operating standards gave minimum age and experience standards, along with restrictions on hiring certain persons to be drivers with a history of traffic violations, at-fault accidents or serious driving-related violations. After drivers were hired, both the Standard Franchise Agreement and operating standards provided only that drivers strictly comply with all laws, regulations and rules of the road and due care and caution when driving their vehicles. Beyond this, the operating standards added little beyond that already required by the Vehicle Code about how delivery drivers were to operate their vehicles, merely requiring that vehicles be periodically inspected; vehicles not show excessive damage or wear; drivers wear seatbelts and not use their cell phones while driving; and drivers not having other persons in their vehicles during deliveries

unless that passenger was approved personnel. While these standards touched on delivery services, none of them gave Domino's daily control over the manner in which those services were accomplished.

After reviewing Domino's rights relating to Robizza's employees, under the franchise agreement, Robizza retained internal day-to-day control over its employees and delivery drivers. As discussed, other than setting basic minimum standards for the driver's qualifications, vehicle and safe operation, Domino's had no daily control over the delivery driver that caused the accident leading to this action. Indeed, Domino's had no connection or right to control the driver, as it was Robizza who hired, trained, supervised and paid him. The franchise agreement shows that Robizza had day-to-day control over the store's employees and delivery drivers. *See Myszkowski, supra*, at 626-27 (finding Penn Stroud managed day-to-day operations of the business, in part, because it hired, fired, paid and supervised the hotel's employees); *Green, supra*, at 210 (oil company and service station were independent contractors, in part, because station hired and fired its own employees).

We conclude the same about the other aspects of the franchise agreement. Moreover, Robizza still had the responsibility of implementing these standards on a day-to-day business. To that end, Robizza was responsible for (1) constructing the store or leasing its premises; (2) obtaining all required permits for the store (building, driveway, utility, health, sanitation, and sign); (3) buying or leasing equipment, fixtures, furniture and signs; (4)

buying ingredients, beverages, cooking materials, containers, packaging materials, paper and plastic products, utensils, uniforms, menus, forms, and cleaning supplies; (5) having its own bank account and keeping its own books and records; (6) direct, on-premises supervision of the store at all times; and (7) obtaining and carrying insurance for the store. Moreover, Domino's had no ownership interest in Robizza, nor did it compensate Robizza as its employee. Concerning the latter, under the franchise agreement, Domino's received a royalty fee from Robizza out of its sales to customers. Taken together, we find that these factors show that Robizza retained day-to-day control over the operations of the store.

That this was the case, we find, is not diminished by the fact that Domino's reserved the right to inspect the store at any time and terminate the franchise under certain conditions. We note as to inspection, however, that Domino's power was not unfettered, as it needed to provide written notice and an opportunity to cure any alleged defective conditions. In any event, as we recognized in **Myszkowski**, the ability to terminate the alleged servant does not necessarily indicate that there was a continuous subjection to the will of the alleged master so as to create a master-servant relationship, especially when the franchisee could seek legal redress for any such termination. **See Myszkowski**, **supra**, at 627; **see also Green**, **supra**, at 211 (finding that right to terminate relationship with cause not dispositive of master-servant relationship).

Additionally, as noted, the Standard Franchise Agreement disclaimed any master-servant relationship between Domino's and Robizza, stating explicitly that the franchisor and franchisee were "independent contractors." Of course, such a statement does not resolve what kind of relationship was created between the parties. *See George v. Nemeth*, 233 A.2d 231, 233 (Pa. 1967). That said, while not dispositive, inclusion of this provision is clearly consistent with what the other provisions show, namely, that Robizza had control over the day-to-day operations of the store. *See Myszkowski*, *supra*, at 627 (noting that agreement between Best Western and Penn Stroud specifically provided that their relationship was that of independent contractors).

Accordingly, after reviewing the franchise agreement, we hold that Domino's did not control or have the right to day-to-day control over how Robizza operated his store. Because Domino's did not have such control under the franchise agreement, it could not be held vicariously liable for the negligence of Robizza's employees, since the relationship between the two parties was that of independent contractor-contractee rather than master-servant.[16] In accordance with this finding, we reverse and remand to the trial

---

[16] This outcome is in accord with decisions in other states that Domino's is not vicariously liable for the alleged negligence of an employee of one of its franchisees. *See, e.g., Lind v. Domino's Pizza LLC*, 37 N.E.3d 1 (Mass. Ct. App. 2015) (affirming grant of summary judgment to Domino's because it did not control or have the right to control the policy and practice that allegedly

court for entry of an order that Domino's did not exercise or have the right to exercise sufficient control over its franchisee Robizza such that it could be held vicariously liable for the negligence of Robizza's delivery driver, Morris.

Judgment reversed. Case remanded with instructions. Jurisdiction relinquished.

Judge King joins the Opinion.

Judge Bowes files a Dissenting Opinion.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/8/2023

_____

cause harm to plaintiff); ***Patterson v. Domino's Pizza LLC***, 333 P.3d 723 (Cal. 2014) (finding summary judgment should have been granted to Domino's because it did not control the workplace activities of the employees of the franchisee); ***Bricker v. R&A Pizza, Inc***., 804 F. Supp. 2d 615 (S.D. Ohio 2011) (granting Domino's motion to dismiss harassment and retaliation claims because there was no allegation that Domino's was the employer of the employees of the franchisee); ***Rainey v. Langen***, 998 A.2d 342 (Me. 2010) (affirming grant of summary judgment to Domino's on vicarious liability claims because Domino's quality control requirements and minimum operational standards did not reserve control of the franchisee's day-to-day operations); ***Viado v. Domino's Pizza, LLC***, 217 P.3d 199 (Or. App. 2009) (affirming grant of summary judgment to Domino's on vicarious liability claim because Domino's did not control the daily performance of the delivery drivers of the franchisee); ***Bahadirli v. Domino's Pizza, Inc.***, 873 F. Supp. 1528 (M.D. Ala. 1995) (granting summary judgment to Domino's in Title VII case filed by prospective employee of franchisee because Domino's lacked control over the daily operations of the franchisee, including the hiring and firing of employees).